# In the

# United States Court of Appeals

## For the Seventh Circuit

————————

No. 03-2111

WILLIAM FANSLOW,

*Plaintiff-Appellant,*

v.

CHICAGO MANUFACTURING CENTER, INC.,

*Defendant-Appellee.*

————————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 01 C 3558—**William J. Hibbler** and **John W. Darrah**, *Judges.*

————————

ARGUED JANUARY 6, 2004—DECIDED SEPTEMBER 20, 2004

————————

Before EASTERBROOK, DIANE P. WOOD, and WILLIAMS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* William Fanslow claims that his employer, the Chicago Manufacturing Center (CMC), retaliated against him in violation of the whistle-blower protections of the False Claims Act (FCA), 31 U.S.C. § 3730(h), the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/4(g), and Illinois public policy, when he reported alleged misappropriations of federal funds to a government official. CMC contends that it terminated Fanslow for legitimate, non-retaliatory reasons, including performance prob-

lems. Although the district court ruled in favor of CMC, we conclude that its grant of summary judgment was premature. We reverse and remand for further development of the record.

**I**

As is common with FCA cases, this one turns heavily on the facts, which we must therefore recount in detail, in the light most favorable to Fanslow. CMC is a nonprofit corporation established to provide information technology (IT) consulting services to small- and medium-sized manufacturing enterprises in the Chicago area. CMC is sponsored by the Manufacturing Extension Plan (MEP), under the auspices of the National Institute of Standards and Technology (NIST), an agency of the Department of Commerce. NIST funding accounts for 47% of CMC's operating budget. Another 22% comes from the State of Illinois and the City of Chicago.

In October 1996, CMC hired Fanslow to fill a newly created position of Senior Program Manager. He reported directly to Rosemary Cudzewicz, CMC's Vice President of Operations. Fanslow received his first evaluation from Cudzewicz in June 1997. She was "extremely pleased" with his performance and did not recall having any negative criticism. Cudzewicz was unconcerned that Fanslow had not met all of his quantitative goals because these goals reflected Fanslow's best estimate of what he would try to accomplish in the new position. CMC's evaluation process required the employee and the supervisor to decide on a final rating that they agreed represented the employee's achievements and performance over the rating period. Fanslow and Cudzewicz agreed that Fanslow "exceeded job requirements," as evidenced by a 4.5 (out of 5) rating. Cudzewicz felt that Fanslow had made substantial accomplishments in his new position and worked well with CMC clients and employees.

Presumably as a result of his high evaluation, Fanslow's job responsibilities and salary increased steadily over time. In October 1997, he was designated as the team leader to select a new customer relations management system for CMC. In April 1998, Fanslow was promoted to the position of Director of Information Technology for CMC and took on increased responsibility for internal IT systems. On September 1, 1998, Fanslow's salary increased from $78,850 to $90,000. About a year later, it rose to $125,000.

Sometime in June 1998, Cudzewicz resigned and left CMC. Shortly before she left, Cudzewicz prepared her second evaluation of Fanslow's job performance. Cudzewicz emphasized that her preliminary rating of 3.5 should not be viewed as final because she had not met with Fanslow to discuss her score, nor had she taken account of his independent rating, as required by the CMC evaluation process. CMC's President, Demetria Giannisis, instructed Cudzewicz not to meet with employees to finish evaluations after Cudzewicz tendered her resignation. As a result, Fanslow did not receive a formal or final evaluation in 1998. Although she was unable to give Fanslow a final rating before she left CMC, Cudzewicz considered Fanslow to be an "effective and competent manager working under less than optimal conditions. He worked well with and was respected by his subordinates and other managers. He was very well liked and respected by CMC clients and consistently received high ratings from them."

After Cudzewicz's departure, Fanslow reported directly to Giannisis. Several CMC employees described Giannisis as a difficult and unpleasant manager. One claimed that Giannisis "used micromanagement, threats, and a volatile temper to harass and intimidate employees whom she felt questioned her judgment or refused to follow directions regardless of the ethical or legal implications." This employee stated that Giannisis used "pretextual, often false allegations" to reprimand or terminate employees and that this resulted in extremely high employee turnover, low morale,

and very low productivity. Another employee commented on Giannisis's "routine practice of abusing, berating, and yelling at her employees."

As already stated, one of Fanslow's primary responsibilities in 1998 was to lead a team in selecting an improved customer relations management system. This system would be used to generate internal reports as well as reports required by organizations such as NIST. Fanslow and other team members ultimately recommended that CMC adopt a system that came to be known as VAULT. Fanslow explained that the team jointly and unanimously made all decisions regarding the VAULT selection and worked together to develop implementation procedures. Giannisis was a member of this team. The VAULT system was implemented in early 1999.

In October 1999, Fanslow and Giannisis identified his goals for the year 2000. The first goal was to "[s]tabilize new CMC systems," which Fanslow understood to refer to the VAULT system. Fanslow knew that there were problems getting the VAULT system off the ground because of dial-in problems and the stability of the Windows operating platform. He understood that Giannisis wanted some of the day-to-day problems with computers crashing to go away. Fanslow's second goal was to "[w]ork with IT junior level staff to improve relationship, attitude, and working environment." Fanslow understood this to mean that he needed to spend more time bringing junior level staff up to speed. He did not recall discussing specific problems or particular relationships that needed attention.

There is conflicting evidence regarding Fanslow's performance during the period following the VAULT implementation. David Swirnoff, CMC's Director of Human Resources, asserted generally that there were "ongoing problems, (e.g., staff management and VAULT system complaints) and external (e.g., lack of sales) with the IT department and Mr.

Fanslow's responsibility of them." Yet several CMC employees stated that Fanslow had an excellent reputation as a manager who effectively motivated his team and was widely respected by his peers, employees, and customers.

Sometime in 1999, Fanslow learned of a concept called MFR.Net that was the brainchild of John Panfil, CMC's Vice President. Initially, Fanslow was not sure exactly what MFR.Net entailed because Panfil's concept appeared to be changing constantly. After Fanslow reviewed the MFR.Net business plan at Panfil's request, he expressed concern about the lack of a defined product. Eventually, Fanslow realized that MFR.Net would be a for-profit "dot com" spin-off that would offer web-based services to CMC's manufacturing clients. At some point during the year, Fanslow discussed ownership issues regarding MFR.Net with Panfil. Panfil told him that Giannisis was involved and that Panfil's idea was to grow the company and sell it off for a profit. Fanslow came to believe that Panfil and Giannisis intended to take the spin-off company public and get rich off of it. Fanslow observed CMC's resources being diverted to MFR.Net in the form of travel and labor expenses, legal fees, computer hardware, and equipment. Fanslow identified several individuals who billed their time to CMC even though they worked exclusively on MFR.Net. He believed that these were unallowable costs under CMC's nonprofit funding structure.

Fanslow voiced his concerns to a federal official named Ned Ellington at a conference sponsored by NIST in November 1999. While at a session on e-business strategy, Fanslow heard Ellington announce that NIST did not want its centers engaged in any type of spin-off dot com enterprises. He recalls hearing Ellington say that NIST did not want centers investing funds in start-up companies. Ellington stated that NIST was going back to Congress for approval to fund for-profit businesses in the long term. Fanslow understood Ellington to be saying that this use of funding was

actually unlawful, rather than being simply undesirable; CMC has not disputed this interpretation thus far. After Ellington finished his formal presentation, Fanslow approached him and asked if he was aware of the MFR.Net initiative at CMC. Fanslow told Ellington that CMC was funding and providing labor to MFR.Net. Ellington reiterated his comment that NIST did not want centers, like CMC, to start for-profit dot com ventures.

After returning from this meeting, Fanslow met individually with three CMC executives to discuss Ellington's remarks. He first spoke with Dave Adams, CMC's Director of Finance, who told him that Giannisis was going to do what she wanted. Fanslow then met with Giannisis and relayed Ellington's message. He told her that Ellington did not want CMC using its funding for dot com start-ups because NIST considered that cost to be unallowable. According to Fanslow, Giannisis told him not to worry about it. Fanslow testified that he conveyed Ellington's message to Giannisis because he was concerned about jeopardizing CMC's funding if the center was engaged in anything illegal or unallowable. Finally, Fanslow told Panfil, who responded without commenting.

In the months after these meetings, Fanslow focused on improving the stability of the VAULT system. Fanslow testified that a number of factors contributed to CMC's problems with VAULT. CMC employees were not following established protocol in submitting their report requests, and CMC's database administrator, who Fanslow believed to be inexperienced, did not effectively communicate with the employees about their report requests. As a result of these problems, CMC was tardy in submitting its required reports to NIST. Fanslow held weekly meetings, which Giannisis attended, focusing on these implementation problems with VAULT. Fanslow understood that Giannisis was unhappy with dial-in capability problems and workstation computer crashes that prevented the user from accessing VAULT. He

believed that some of the dial-in problems could have been caused by the outdated wiring in the old warehouse that housed CMC. In fact, in its annual report to NIST, CMC blamed VAULT implementation problems on the technical infrastructure problems in the building. Fanslow also knew that Giannisis was dissatisfied with the lack of timeliness of the NIST reports. By June 2000, however, this problem appeared to be solved. CMC submitted its first timely VAULT-generated report to NIST that month.

As Fanslow focused on stabilizing the VAULT system, he and other CMC employees continued to ask questions about MFR.Net. For example, MFR.Net ownership issues came up at a CMC staff meeting. Fanslow recalls that someone asked if MFR.Net was "legal or not." He testified that Giannisis assured the staff that she thought MFR.Net was legal. Fanslow believed that CMC's staff questioned the legality of MFR.Net because it did not meet any known mission of the organization. Fanslow testified that he received numerous questions about MFR.Net from his IT staff, including one person who reported directly to him, Bill Weiand. CMC employee Richard Kennedy stated that he and other employees expressed concern "over the fact that government funds given to CMC were being diverted to MFR.Net." He stated that CMC employees, including Fanslow, felt that they were left in the dark regarding MFR.Net's ownership and funding structure. When Kennedy asked Panfil directly about these issues, he was unable to get any answers.

CMC employees vocalized these concerns at a "kick-off" meeting for MFR.Net on July 17, 2000. One of Panfil's employees presented the new entity to a group that included CMC employees, as well as representatives from outside organizations known as CMC affiliates. A representative from one of the affiliates asked who specifically had an ownership interest in MFR.Net and was told by the presenter that CMC was the majority owner. Fanslow testified

that the attendees pushed as to the identity of the other owners but did not receive clear answers. Other attendees asked if MFR.Net's product was fully developed and ready to be delivered and how it compared to other website development products in the marketplace. The presenter apparently could not answer these questions about MFR.Net's product capabilities and decided to end the meeting early. Fanslow did not ask any questions during this group meeting.

Despite his nonparticipation in the morning meeting, Fanslow was called on the carpet later that afternoon by Giannisis. Weiand and another IT staff member were also present. Giannisis accused Fanslow and the IT group of "sabotaging" the morning meeting. Fanslow disagreed and told her that the IT department was not willing to endorse the MFR.Net product without more information. Weiand told Giannisis that the questions being asked were valid and needed to be answered. A day or two after this meeting, Giannisis instructed Fanslow to fire Weiand. According to Fanslow, Giannisis was upset with Weiand during the afternoon meeting on July 17 because she thought he was "being disrespectful." Fanslow refused to terminate Weiand because he believed that the questions Weiand asked were legitimate and needed to be answered. He also told her that CMC could not easily replace Weiand. Giannisis relented but asked Fanslow to migrate Weiand out of the organization over a period of time.

The record indicates that Fanslow's concern about the alleged misappropriation of CMC resources to MFR.Net extended beyond conversations with CMC executives and employees. He recalled at least two incidents involving the purchasing of computers for MFR.Net, one several months before the July 17 meeting and the other one several months after the July 17 meeting. On both occasions, Fanslow was asked to purchase hardware for MFR.Net using CMC funds. He refused, telling Panfil and Giannisis that he considered these costs to be unallowable. Fanslow testified that Panfil

was "furious" when the IT department would not sign the requisitions for the equipment. Fanslow testified that he talked with Giannisis "numerous" times about MFR.Net. He repeatedly told her that CMC should not be using its resources on MFR.Net because of the NIST policy (which he believed Ellington to be describing) prohibiting spin-off dot com companies. Fanslow was particularly concerned that CMC's reporting structure did not allow for clear documentation of funds spent on MFR.Net; he believed that there was a commingling of nonprofit and for-profit funds because CMC employees were not provided with a separate accounting code for MFR.Net.

On July 24, 2000, only one week after he was accused of sabotaging MFR.Net, and a few days after he refused to fire Weiand, Fanslow was called into a meeting by Giannisis and Human Resources Director Swirnoff. According to Swirnoff, the meeting was called to inform Fanslow that he was being placed on a Performance Action Plan (PAP) due to management's ongoing concerns with his performance as Director of IT. Fanslow explained, however, that PAPs were Giannisis's method of firing someone that angered her. Both Weiand and Kennedy testified that Giannisis used PAPs to discriminate against, harass, and ultimately terminate the targeted employee who had crossed her. Kennedy, who was placed on a PAP, stated that these plans contained impossible-to-attain goals and targets as a condition of continued employment.

Although Giannisis told Fanslow that the focus of the PAP was going to be on internal IT issues, Fanslow believed that he was put on a PAP because he voiced concerns about MFR.Net. In the original version of the PAP that Fanslow received, Giannisis raised concerns about the IT group's failure to generate standardized reports in a timely fashion and Fanslow's failure to ensure that new CMC employees received IT support. For example, Giannisis identified two new employees who had failed to receive their new laptops, cell phones, and VAULT passwords in a timely manner.

Fanslow responded to her concerns in writing, explaining that high employee turnover made it very difficult for IT to ensure that all new employees received their equipment quickly. Fanslow further explained that many of the problems with VAULT were not solely technical, but implicated management's commitment to the product. Giannisis raised other concerns in the PAP, like Fanslow's practice of working from home. Fanslow responded that this had never been an issue before and that working from home facilitated his visits to CMC clients in the Chicago suburbs near his home. On August 7, 2000, Fanslow received a revised version of the PAP that incorporated some of his comments. According to this document, the PAP would be in effect until October 31, 2000.

In response to the concerns raised in his PAP, Fanslow recommended that Giannisis retain a third party to conduct an audit of CMC's IT department. Swirnoff claims, however, that a third party was brought in because of Fanslow's ongoing performance problems. Giannisis hired consultants from CNA, who Fanslow testified were there to help the IT department determine whether it should upgrade the VAULT system or switch to an entirely different database. The CNA report appears to confirm Fanslow's evaluation of the system. In its summary section, CNA noted that "the issues CMC is experiencing with the VAULT application are not unusual. Certainly the issues are frustrating, especially relative to the high expectations one would have with a new application system, but some of them are to be expected." Despite the problems with VAULT, CNA did not recommend that CMC switch vendors because CNA felt that VAULT's poor performance resulted from inadequate data entry by CMC employees. CNA made several recommendations, including improved training and more visible management commitment to the VAULT application. The CNA report did not evaluate Fanslow's job performance.

After Fanslow's PAP expired on October 31, 2000, Giannisis informed him that she had retained another consultant named Kathy Grady to assist the IT department. According to Grady's affidavit, she was there to "coach" Fanslow. Fanslow claims he was unaware that this was one of Grady's responsibilities and that she did not "coach" him. According to Fanslow, he and Grady had an amicable relationship, but he did not feel that she offered any particular guidance to him in addressing CMC's technical problems. Fanslow felt that CMC's problems stemmed from management's reluctance to spend the money on the necessary computer software and hardware upgrades. Grady believed that there were problems between the IT department and CMC's staff, and that Fanslow had some responsibility for these problems as Director of IT.

The events leading up to Fanslow's termination started on December 7, 2000, when CMC moved its offices to a new location. Fanslow was charged with transferring the entire IT infrastructure and had scheduled to backup the organization's data files prior to the move. When Fanslow asked Weiand if the scheduled backup was on target, he was informed that a newly hired employee named Brian Ferrentino had pulled the plug connected to the backup server. Fanslow told Weiand to restart the server. Later that evening, Fanslow approached Ferrentino to discuss performance issues and told Ferrentino that he "needed to get his fucking butt in gear and be part of the team."

On December 11, five days after the move, Giannisis called Fanslow into a meeting with Swirnoff and Grady and asked if he had cursed at Ferrentino. After Fanslow admitted that he had used a curse word in his discussion with Ferrentino, he asked Giannisis why this incident had caused such a stir. According to Fanslow and other employees, use of profanity was commonplace at CMC and that Giannisis often used the word "fuck" when speaking with other employees. The following day, Giannisis and Swirnoff

terminated Fanslow. At the time of his termination, the only thing Giannisis told Fanslow was that she did not feel that he was "happy" with his employment at CMC. Swirnoff recommended that Giannisis terminate Fanslow because of his "unprofessional conduct" towards Ferrentino, which Swirnoff viewed as the "last straw" in light of Fanslow's ongoing performance issues. Fanslow, however, thinks that he was terminated for refusing to support MFR.Net, an initiative that he believed violated CMC's status as a non-profit entity receiving federal funds because it diverted those funds to impermissible uses. His termination came within six months of being told by Giannisis that he had "sabotaged" MFR.Net and within four months of being placed on a PAP.

## II

We review the district court's grant of summary judgment in favor of CMC *de novo*, construing all facts and inferences in the light most favorable to Fanslow, as the non-moving party. *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1028 (7th Cir. 2004). As the Supreme Court explained in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), the substantive law will identify which facts are material and only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment. *Id.* at 248.

The governing law in this case is the False Claims Act, 31 U.S.C. § 3729-§ 3732 (2004), which imposes a civil penalty and treble damages upon any person who presents to the United States Government "a false or fraudulent claim for payment or approval." *Id.* § 3729(a). To enhance enforcement, the Act permits private persons known as relators to bring *qui tam* actions on behalf of the government. *Id.* § 3730(b); see also *Hindo v. Univ. of Health Sci./ The Chi. Med. Sch.*, 65 F.3d 608, 612-13 (7th Cir. 1995).

Congress amended the False Claims Act in 1986 to provide for "whistleblower" protection by adding a new subsection (h), which provides that:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee . . . in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole . . . .

31 U.S.C. § 3730(h). A plaintiff may proceed under subsection (h) independently of a *qui tam* action. *Neal v. Honeywell Inc.*, 33 F.3d 860, 865 (7th Cir. 1994) ("Damages under § 3730(h) compensate an employee for harm caused by the harassment and discharge; they are not a substitute for the recovery an employee could have had in a *qui tam* suit.").

As the district court recognized, Fanslow had to present evidence at the summary judgment stage supporting the following elements of his claim: (a) his actions were taken "in furtherance of" an FCA enforcement action and were therefore protected by the statute; (b) his employer had knowledge that he was engaged in this protected conduct; and (c) his discharge was motivated, at least in part, by the protected conduct. *Brandon v. Anesthesia & Pain Mgmt. Assoc., Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002). We therefore turn to the evidence in the summary judgment record on each of these points.

A

Fanslow must first show that he engaged in protected conduct under the FCA. The plain language of the statute provides that an employee may not be retaliated against

"because of lawful acts done . . . *in furtherance of* an action under this section, including *investigation for*, initiation of, testimony for, or assistance in an action filed or to be filed." 31 U.S.C. § 3730(h) (emphasis added). The term "protected activity" is interpreted broadly, in light of the purpose of the statute. See generally *United States ex rel. McKenzie v. BellSouth Telecommunications, Inc.*, 123 F.3d 935, 944 (6th Cir. 1997) ("The statute provides examples of the types of activity that are protected, including investigation, initiation of a suit, and testimony, but these examples are not exclusive . . . .").

An employee need not have actual knowledge of the FCA for her actions to be considered "protected activity" under § 3730(h). If so, only those with sophisticated legal knowledge would be protected by the statute. *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 741 (D.C. Cir. 1998) (". . . only [lawyers] would know from the outset that what they were investigating could lead to a False Claims Act prosecution."). In the past, we have said that an employee must show that an FCA action is a "distinct possibility" at the time of the investigation for her actions to be considered "protected activity." *Neal*, 33 F.3d at 864. This was not meant to contradict the rule that does not require actual knowledge of the FCA, however. It implied instead that there is an objective component to the test for a claim under § 3730(h), as well as a subjective one. We agree with several of our sister circuits, which have held that the relevant inquiry to determine whether an employee's actions are protected under § 3730(h) is whether: "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002). See also *Wilkins v. St. Louis*, 314 F.3d 927, 933 (8th Cir. 2002) (adopting the *Moore* standard); *McNeil v. Empl. Sec. Dep't*, 2002 Wash. App. LEXIS 1900, at *15-16

(D.C. Cir. Aug. 9, 2002) (same). We now consider how Fanslow fares under that standard.

Fanslow was concerned that the CMC executives were taking actions inconsistent with the funding restrictions imposed by NIST. He believed that CMC was submitting false claims for reimbursement—claims that asked NIST for funds for CMC, although the funds were really being diverted to MFR.Net or other impermissible uses. The question now is whether he submitted enough evidence on these matters to survive summary judgment.

Pursuant to 15 U.S.C. § 278k, Congress authorized NIST to establish Regional Centers, like CMC, to "enhance productivity and technological performance in United States manufacturing." 15 U.S.C. § 278k(a). The statute requires each center to be affiliated with a United States-based nonprofit institution or organization, or group of such entities, that applies for and is awarded financial assistance by the federal government. *Id.* The implementing regulations provide that the Regional Centers will be operated under cooperative agreements with NIST, 15 C.F.R. § 290.3(d), and that all financial awards by NIST "shall be subject to all Federal and Departmental regulations, policies, and procedures applicable to Federal assistance awards." *Id.* § 290.4(a).

Fanslow believed that CMC and its executives violated the terms of a NIST cooperative agreement that involved $700,000 of federal funds. The agreement recognized CMC's nonprofit status and required CMC to establish "an appropriate corporate status and structure" for any venture created under the agreement. As Fanslow saw it, CMC executives were defrauding the federal government by diverting CMC's nonprofit funds to a for-profit entity in which the executives had a personal stake. He claims that he was engaged in protected investigatory conduct on several occasions: (1) when he discussed MFR.Net with NIST official

Ellington, (2) when he refused to purchase equipment for MFR.Net using CMC funds, and (3) when he repeatedly asked CMC executives about the funding and ownership structure of MFR.Net. In this litigation, however, CMC asserted that it was clearly authorized to create and fund a web of for-profit ventures under its cooperative agreements with NIST. It argued before the district court that any allegation to the contrary would be so baseless and frivolous that it would violate FED. R. CIV. P. 11.

It is unclear on this record, however, whether Fanslow sufficiently understood, or should have understood, the terms of the NIST agreements at the time of his investigation and whether a reasonable employee in these circumstances would have thought the same. As the district court noted, Fanslow knew that CMC received substantial funding from NIST, and Fanslow specifically approached an NIST official to ask about the propriety of MFR.Net. This official indicated that NIST did not yet have approval for start-up ventures. The record indicates that Fanslow and other employees could not get straight answers from CMC executives about MFR.Net, and that they witnessed the diversion of CMC resources to MFR.Net without apparent authorization or proper accounting. The record includes no evidence from key CMC executives offering their version of what Fanslow and other employees were told about MFR.Net. Aside from an affidavit submitted by Swirnoff, which does not even mention MFR.Net, there are no affidavits or depositions from Giannisis or Panfil or any other CMC executive with relevant knowledge.

Congress intended to protect employees from retaliation while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together. *Neal*, 33 F.3d at 864; *United States ex rel. Yesudian*, 153 F.3d at 739. The statute does not, however, protect an employee who just imagines fraud without proof. *Neal*, 33 F.3d at 864; *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730,

733 (7th Cir. 1999). In the case before us, the record is simply too thin at this point to conclude that Fanslow was unreasonable to think CMC might be committing fraud on the government by submitting claims for funds that appeared to be for permitted uses within CMC itself, but that were really being diverted to impermissible uses.

A few further points are also important. The district court's analysis of Fanslow's investigatory activity focused solely on the interaction with Ellington in November 1999. As to that, the court concluded that it constituted protected activity, "albeit just barely." Although the court suggested that Fanslow's investigation of fraudulent conduct was not very extensive, it ultimately found that a reasonable juror could conclude that Fanslow was in the initial stages of investigating possible fraud because of his discussion with Ellington. In our view, Fanslow's conversation with Ellington can comfortably be characterized as investigatory conduct. Fanslow initiated contact with Ellington, a federal official in the relevant agency, after hearing Ellington say that centers, like CMC, should not be engaged in spin-off ventures. Relying on the accuracy of the official's advice, he reported this communication to his supervisors at CMC. Fanslow had seen resources being diverted to MFR.Net and was aware that MFR.Net was supported solely by CMC funds because no separate accounting mechanism existed for MFR.Net activities.

The district court's conclusion that Fanslow presented a "weak" case also failed to consider whether any of Fanslow's other actions could constitute protected conduct. On appeal, Fanslow contends that his protected activity extended beyond the meeting with Ellington. First, Fanslow asserts that he lodged numerous internal complaints when he spoke with Panfil and Giannisis about his concerns regarding MFR.Net. Other circuits have recognized internal complaints as FCA-protected conduct. *Yesudian*, 153 F.3d at 741 n.9 (citing cases). While we have not explicitly held that internal com-

plaints constitute protected conduct, *Neal* specifically rejected the argument that a plaintiff must raise her concerns directly to the government to qualify for protection. 33 F.3d at 865 (noting that it was appropriate for plaintiff to complain through corporate channels). As the D.C. Circuit has explained, there are sound reasons for finding that internal complaints are protected:

> Nor would it be in the interest of law-abiding employers for the statute to force employees to report their concerns outside the corporation in order to gain whistleblower protection. Such a requirement would bypass internal controls and hotlines, damage corporate efforts at self-policing, and make it difficult for corporations and boards of directors to discover and correct on their own false claims made by rogue employees or managers.

*Yesudian*, 153 F.3d at 742. With a more fully developed record, the district court should consider whether Fanslow's actions were the type of internal complaints protected by the FCA.

Fanslow also argues that he engaged in protected conduct by refusing to purchase hardware for MFR.Net expressly because he considered the purchases to be unallowable. Fanslow explained that on at least two occasions he refused to purchase hardware for MFR.Net using CMC funds. CMC counters that the refusal to purchase hardware is not significant because Fanslow could not identify the time period in which this happened. The record shows, however, that the time period was quite clear. Fanslow's deposition testimony demonstrates that he refused to purchase hardware on two occasions, in his words "a couple of months before and a couple of months after" the July 17, 2000 meeting at which he was accused of sabotaging MFR.Net. Invoices produced in discovery revealed that Fanslow's first refusal to purchase the equipment occurred on June 21, 2000, approximately one month before Fanslow was put on a PAP.

The district court never considered whether this refusal would also constitute protected conduct under the FCA. Fanslow further argues that he engaged in protected conduct by refusing to fire Weiand after Weiand questioned the MFR.Net scheme. The relevance of this to his claim is less clear, but we leave its further development for the district court's consideration in the first instance.

One final point warrants comment. In a footnote to its discussion of Fanslow's protected conduct, the district court stated that Fanslow "frequently offered in his affidavit facts that he did not raise at his deposition. Such a tactic is inappropriate and the Court will disregard his new evidence." A careful comparison of Fanslow's affidavit with his deposition testimony shows, however, that the affidavit consistently tracks Fanslow's deposition testimony. In its memorandum opinion, the district court faulted Fanslow for supposedly claiming in his affidavit that he "told the NIST official that CMC had been illegally diverting NIST funds to MFR.Net." The district court found that Fanslow had failed to raise this point at his deposition. A review of the record shows that Fanslow made no such claim in either his affidavit or his deposition. According to his affidavit, Fanslow asked Ellington "whether he knew CMC's relationship to MFR.Net." Fanslow then told Ellington "that CMC was funding and providing labor to MFR.Net." Fanslow's affidavit further stated that "[d]uring that discussion, it became clear . . . that NIST did not know about the relationship between CMC, Panfil and MFR.Net . . . ." This narrative is consistent with Fanslow's deposition, in which he testified that he approached Ellington and asked if Ellington "was aware of the MFR.Net initiative at CMC." This is not a situation where a plaintiff has directly contradicted her own earlier statements, without explaining the contradiction or attempting to resolve the disparity. *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1315 n.3 (7th Cir. 1989). We find no inherent inconsistency between Fanslow's affidavit and deposition.

Thus, Fanslow's affidavit is distinguishable from those at issue in *Rogers v. City of Chicago*, 320 F.3d 748, 751 (7th Cir. 2003), and *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001), the two cases cited by the district court in support of its decision to disregard Fanslow's affidavit. In *Rogers*, we found that the district court properly disregarded an affidavit that "contained numerous paragraphs that contradicted, in self-serving respects, [Rogers's] deposition testimony, contained inadmissible hearsay, or relied often on unauthenticated documents." 320 F.3d at 751. "The district court was under no obligation to scour Rogers's affidavit in order to glean what little admissible evidence it may have contained." *Id.* Fanslow's affidavit does not suffer from any of these defects. In *Albiero*, we stated that a plaintiff cannot defeat summary judgment by submitting a self-serving affidavit that contains "the bald assertion of the general truth of a particular matter." 246 F.3d at 933 (quoting *Drake v. Minn. Mining & Mfr. Co.*, 134 F.3d 878, 887 (7th Cir. 1998)). Rather, the affidavit must "cite specific concrete facts establishing the existence of the truth of the matter asserted." *Id.* Fanslow's affidavit conforms to this latter standard. We therefore conclude that the district court abused its discretion in excluding this evidence from consideration.

In sum, the protected conduct element of Fanslow's retaliation claim needs further development. On remand, both parties should address more concretely the question whether Fanslow in good faith believed and a reasonable employee in similar circumstances would have believed that CMC was committing fraud on the government in the actions Fanslow has identified. The record should be developed further to show which of CMC's claims for federal funds Fanslow thought were fraudulent or false: What was CMC telling NIST about its use of the funds? What did Fanslow reasonably believe it was saying? Finally, the district court should consider whether Fanslow's actions beyond his discus-

sion with Ellington constitute protected FCA conduct, taking into account the facts as presented in Fanslow's affidavit.

## B

Turning to the second element, Fanslow must demonstrate that his protected conduct put CMC on notice of the distinct possibility of a *qui tam* action. *Brandon*, 277 F.3d at 945. We have held that a retaliatory complaint must be dismissed if the employer did not know about the whistleblower's protected conduct before it discharged him. *Luckey*, 183 F.3d at 733. The district court concluded that Fanslow had failed to meet the notice requirement because he did not use "the terms illegal, fraudulent, or false" in his discussions with CMC about the funding of MFR.Net. According to the district court, Fanslow's use of the word "unallowable" did not go far enough. The district court emphasized the fact that Fanslow did not ask questions about MFR.Net during the morning meeting on July 17, 2000, and did not discuss MFR.Net with CMC's management after this meeting. There are several problems with the district court's analysis.

The district court erroneously held Fanslow to the heightened notice standard that is reserved for employees who are charged with discovering fraud in the normal course of their job duties. In *Brandon*, we explained why it is important to consider whether monitoring is part of the employee's ordinary job. Brandon was an anesthesiologist who discovered that some of his associates were falsifying the bills they submitted to Medicare. 277 F.3d at 939. He obtained copies of the relevant Medicare regulations and brought his concerns to the attention of his colleagues. Shortly thereafter, Brandon began to experience problems at work and was eventually discharged. *Id.* We found that Brandon's employer was not on notice of a possible *qui tam* action—even

though Brandon used terms like "illegal," "improper," and "fraudulent" when he raised concerns about the Medicare billing practices—because this type of monitoring was part of his job:

> It is more accurate to say that Brandon's investigation of the billing reports was part of the general course of his responsibilities. At trial, [the employer] testified that one of Brandon's job duties was to ensure that the billing practices complied with Medicare rules and regulations. Thus, the fact that Brandon was alerting his supervisors to the possibility of their non-compliance with the rules would not necessarily put them on notice that he was planning to take a far more aggressive step and bring a *qui tam* action against them or report their conduct to the government.

*Brandon*, 277 F.3d at 945. Other circuits have also identified a heightened notice requirement for employees who are charged with investigating fraud. *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 867-68 (4th Cir. 1999); *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1523 n.7 (10th Cir. 1996); *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951-52 (5th Cir. 1994).

These cases suggest that a "fraud-alert" employee may be expected to use words like "illegal" or "unlawful" when sharing her concerns with her employer. *Robertson*, 32 F.3d at 951. Fanslow's IT job, in contrast, did not have any such reporting or investigatory duties, and therefore he was not required to use any magic words to put CMC on notice of his investigation into MFR.Net. (We note parenthetically our puzzlement with the district court's conclusion that Fanslow's use of the term "unallowable" was insufficient to put CMC on notice of his protected conduct. *Webster's Third New International Dictionary* defines "unallowable" as "not allowed; impermissible; unpermitted." These synonyms evoke the same idea as "illegal," defined by *Webster*'s as "contrary to or violating a rule having the force of law." See

*United States ex rel. Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512, 1524 (9th Cir. 1995), *rev'd on other grounds*, 520 U.S. 939 (1997) (observing that the knowing submission of "*unallowable* costs can trigger the False Claims Act" (emphasis added)).

Because he was not a fraud-alert employee, Fanslow had to show only that CMC was aware of his investigation, a point for which there is ample support in the record. Fanslow claims that he returned from his meeting with Ellington in November 1999 and immediately reported his conversation to three CMC executives, including Giannisis and Panfil. He did so because he was concerned about jeopardizing CMC's funding if the center was engaged in anything illegal or unallowable. It does not appear that any of these executives tried to reassure him at that time that his concerns were unfounded. Moreover, Fanslow argues that his refusal to approve the purchase of the equipment in June 2000 also served to put CMC on notice of his protected conduct. The record as it now stands suggests that CMC was acutely aware of its employees' concerns about the legality of MFR.Net. Kennedy, who worked with Panfil on MFR.Net, stated that Fanslow and other CMC employees had "numerous conversations" about the diversion of government funds. According to Kennedy, no one could get a straight answer about MFR.Net's ownership and funding structure. Weiand asserted that CMC employees discussed the "diversion of CMC's financial resources to for-profit entities" as well as "the apparent conflicts of interest, and illegal use of government monies."

In concluding that Fanslow failed to meet the notice requirement, the district court emphasized Fanslow's silence during the morning meeting on July 17, 2000 and the fact that he did not discuss MFR.Net with CMC's management after this meeting. The district court's emphasis on these facts is peculiar. Despite Fanslow's nonparticipation in the morning meeting, he was nonetheless dragged into a

conference room by Giannisis that same afternoon and accused of sabotaging MFR.Net. Thus, a reasonable juror could infer that CMC imputed to Fanslow the concerns raised in the morning meeting about the ownership and legality of MFR.Net. Further, Fanslow was placed on a PAP one week after this meeting. He understood that PAPs were used when Giannisis intended to terminate an employee. At this point, he could reasonably have concluded that his job was on the line because of his continued complaints about MFR.Net. Drawing all reasonable inferences in Fanslow's favor, we believe that a jury could conclude that by the time he refused to purchase the computer equipment in 2000, Fanslow had given CMC numerous indications of his concern with MFR.Net and thus met the notice requirements of the FCA.

## C

Turning to the last element, Fanslow must demonstrate that his discharge was motivated, at least in part, by the protected conduct. *Brandon*, 277 F.3d at 944. Compare *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) (discussing mixed motive standard for Title VII cases and holding that the plaintiff may use either direct or circumstantial evidence to show that the protected characteristic was a motivating factor in the challenged employment decision). Once the plaintiff has made this showing, "the burden of proof shifts to the employer to prove affirmatively that the same decision would have been made even if the employee had not engaged in protected activity." *Yesudian*, 153 F.3d at 736 n.4.

We are unable to apply this legal standard to Fanslow's case at this point, because the record lacks explanations from the key decisionmakers, including Giannisis, about why she placed Fanslow on a PAP and ultimately terminated him. The district court concluded that Fanslow had failed to show a causal connection between his whistle-

blowing activities and these adverse employment actions. In our view, however, the evidence is not so one-sided at this point as to warrant summary judgment in CMC's favor.

From the time CMC hired Fanslow in October 1996 until his discussion with Ellington in November 1999, he received a stellar evaluation, four significant pay raises (his salary went from $70,000 to $125,000), and a promotion to lead CMC's IT department. CMC employees noticed that Giannisis's and Panfil's praise turned increasingly to criticism only after Fanslow reported on his discussion with Ellington.

Even more telling is the series of closely timed events in June and July 2000. *Holland*, 883 F.2d at 1315 (stating that a "telling temporal sequence" can demonstrate a causal link between adverse action and protected conduct). One of Giannisis's specific complaints to Fanslow about the VAULT system was that CMC consistently submitted untimely reports to NIST. In June 2000, CMC sent a timely VAULT report to NIST for the first time. On June 21, 2000, Fanslow refused to purchase hardware for MFR.Net and told Panfil he considered this cost unallowable. On July 17, 2000, Giannisis accused Fanslow of sabotaging MFR.Net and directed him to fire Weiand because she considered Weiand's questions about the legality of MFR.Net inappropriate. Fanslow refused to do so and a few days later Giannisis placed him on a PAP. During the time he was on the PAP, Fanslow recommended to Giannisis that CMC obtain an independent evaluation of the IT department and the VAULT system, which confirmed that the problems with VAULT were typical. Fanslow's PAP expired on October 31, 2000 and there is no evidence in the record of any discussions about performance problems after this date. On December 12, 2000, nearly six weeks after the PAP expired, Fanslow was terminated for using "a four-letter word," despite the fact that profanity was commonplace at CMC.

On these facts, Fanslow argues that a reasonable juror could readily infer that his discussion with Ellington, his refusal to purchase hardware, his alleged "sabotaging" of the MFR.Net kick-off meeting, and his refusal to fire Weiand for questioning the legality of MFR.Net played a motivating and substantial role in Giannisis's decision to place him on a PAP and ultimately to terminate him. CMC asserts that it terminated Fanslow based on performance concerns and the reported verbal abuse of Ferrentino. Fanslow was told he was being terminated because Giannisis felt that he was not "happy" with his job, a reason that we find barely passes the straight-face test. The problem is that Giannisis, Panfil, and other relevant CMC executives have not offered any evidence of their side of the story. The conclusory affidavit by HR Director Swirnoff refers only to generalized performance problems and does not give us a sufficient basis to determine what CMC thought. Without evidence that CMC had a legitimate reason for firing Fanslow, the case was not a candidate for summary judgment. Whether, after further discovery on remand, the parties wish to present new motions for summary judgment must await further development of the record and the assessment of the parties at that time.

### D

In addition to his FCA claim, Fanslow alleged that his discharge violated the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/4(g), and Illinois public policy. Relying heavily on its FCA analysis, the district court summarily dismissed Fanslow's state law claims because it concluded that Fanslow had failed to establish the causal connection required to support a claim of retaliation. For the same reasons we are remanding the FCA claim, we remand the state law claims for reconsideration.

### III

For these reasons, we REVERSE and REMAND for proceedings consistent with this opinion.


A true Copy:

    Teste:


                       _____
                    *Clerk of the United States Court of*
                       *Appeals for the Seventh Circuit*