In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-2815

UNITED STATES *ex rel.* ERIC UHLIG,

*Plaintiff-Appellant,*

*v.*

FLUOR CORP., *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:11-cv-04009 — **Michael M. Mihm**, *Judge.*

ARGUED SEPTEMBER 8, 2016 — DECIDED OCTOBER 11, 2016

Before FLAUM, ROVNER, and SYKES, *Circuit Judges.*

FLAUM, *Circuit Judge.* Eric Uhlig brought False Claims Act and retaliation claims against his former employer, Fluor Corporation, and related entities (collectively, "Fluor"). Fluor contracted with the United States Army to provide, among other services, electrical engineering work in Afghanistan.

Uhlig says Fluor violated the False Claims Act when it knowingly breached the terms of its Army contract by using

unlicensed electricians as journeymen and billing the government for the services. Uhlig also contends Fluor wrongfully terminated Uhlig as a whistleblower in violation of 31 U.S.C. § 3730(h).

The district court granted summary judgment for Fluor. We affirm.

## I. Background

The United States Army uses umbrella agreements known as "indefinite delivery, indefinite quantity" ("IDIQ") contracts with private companies to provide support for military personnel. IDIQ contracts provide the general terms under which a contractor is to work but do not delineate specific conditions. The Army then uses "Task Orders" to assign jobs to a contractor.

In 2007, the Army and Fluor entered into an IDIQ contract known as Logistics Civil Augmentation Program IV ("LOGCAP IV"). LOGCAP IV provided a framework for construction, maintenance, and other services in support of military personnel around the world.

LOGCAP IV originally contained no specific provisions governing personnel qualifications. In August 2008, the Army issued LOGCAP IV Contract Modification 4, which provided:

> The Contractor shall ensure that Contractor personnel … possess a license, certification, training, and/or education commensurate with the level of duties to which they are assigned. … Contractor will comply with the terms of this provision if Contractor develops and reasona-

bly implements a Trades Certification and Validation Plan, as approved by the Government, utilizing the master, journeyman, or apprentice model.

Fluor submitted a Trades Certification and Validation Plan as required by Modification 4. The Plan divided craft workers into four categories using "a combination of licenses held, education, training, and experience."

The Plan defined a "helper" as an apprentice who works under constant supervision and a "journeyman" as a skilled craftsperson who may work with minimal supervision and possesses "verifiable minimum experience and/or holds a universally accepted certification, license and/or degree." The Plan also stated that electricians "[m]ay be required to hold a license."

In January 2009, the government approved the Plan, making it the contractual standard by which Fluor employees' qualifications were to be established.

In July 2009, Fluor was awarded Task Order 5, which authorized Fluor to perform a variety of services, including electrical work, at military bases in northern Afghanistan. Before Fluor, a different contractor, KBR, Inc., had been performing this work. To avoid major disruptions in service, the government requested that Fluor attempt to hire KBR employees who were already in Afghanistan. Fluor hired American and British former KBR employees, as well as employees from Bosnia, Macedonia, India, and Pakistan. The employees who were not citizens of the United States or Great Britain were referred to as "other-country nationals."

Uhlig was one of the KBR employees that Fluor hired. Fluor gave Uhlig a one-year foreperson[1] position starting January 23, 2010.

In early 2010, Fluor reviewed its procedures for establishing journeyman electricians' qualifications and decided to require that these electricians hold a state-issued United States license or a Great Britain-issued license. Fluor says that it imposed this requirement not because it was obligated to do so under Modification 4, but rather because it wanted to streamline its qualification process and promote uniformity.

Uhlig had graduated from an apprenticeship program but did not have an electrician's license because his home state of Missouri—like several other states—did not issue electrician's licenses.

By mid-2010, Fluor had implemented its licensing requirement for journeyman electricians being hired in the United States for deployment to Afghanistan. However, the situation was more complicated for electricians like Uhlig, who had already been hired in Afghanistan as "foremen" but lacked state-issued electrician's licenses. No one disputed that the unlicensed foremen were qualified to do journeyman work; nevertheless, Fluor decided to apply its licensing requirement to existing employees.

On November 16, 2010, Fluor emailed its foremen working under Task Order 5, including Uhlig, explaining that licensed

---

[1] At KBR, Uhlig and other workers were "journeymen." Uhlig and other KBR journeymen were hired by Fluor as "foremen" because Fluor did not yet have a job classification named "journeymen," though KBR's pay scale for journeymen matched Fluor's pay scale for its foremen.

foremen would be reclassified as "journeymen" and unlicensed foremen would be reclassified as "helpers." Fluor stated that this change was meant to "bring Fluor into better alignment with our contractual requirements." Accordingly, of the hundreds of Fluor electricians working under Task Order 5, approximately thirty-one, including Uhlig, became "helpers." The others simply changed titles from "foremen" to "journeymen."

Other-country nationals were not eligible for licensing by a state in the United States. Thus, under Fluor's self-imposed licensing procedure, all such employees became helpers, even if, by virtue of their education and experience, they were qualified to perform journeyman work. However, Fluor did not plan to terminate unlicensed other-country nationals in the same way Fluor terminated Uhlig. Fluor says that it was more affordable to retain those employees as helpers because they did not get the same overseas benefits as American helpers.

On November 17, 2010, Fluor offered Uhlig an additional year's employment. However, on November 19 Fluor informed Uhlig that because he did not have a license, he was being reclassified as a helper. Fluor further informed Uhlig that unless he obtained a license before January 23, 2011, the end of his one-year employment, he would be terminated.

Unfortunately for Uhlig, he was out of vacation days and had no opportunity to return to the United States to get an electrician's license by January 2011. Uhlig asked human-resources supervisor Thomas Rizzo for help, but Fluor would not change its position. Uhlig was upset that he would be terminated while the unlicensed other-country nationals—also now all helpers—would stay on.

Uhlig says that after imposing the licensing requirement, Fluor directed helpers to perform unsupervised journeyman work. Uhlig was particularly frustrated after one assignment at a camp called "NKC" and sent an email to Rizzo and Defense Contract Management Agency officer Billy Porter. In it, Uhlig said he was given an assignment he did not think he should be given as an unlicensed helper. Uhlig further stated: "I am a U[S] tax payer losing my job at the end of January because … this company is using my US tax dollars having OCN/A[fg]hans [as] unlicensed electricians going against government compliance." Uhlig had not read Modification 4 or the language of the Trades Certification and Validation Plan at that point.

Rizzo asked Uhlig why he had contacted the government directly instead of pursuing available channels through Fluor. Uhlig responded in a December 4, 2010 email: "I am just following a US taxpayer's obligation to report fraud waste and abuse from stiffing the US government." Uhlig again copied Porter on the email, but also sent the email to mdoyle@doyleraizner.com, stating that Mr. Doyle was his attorney, and to mssparky@mssparky.com. Ms. Sparky was a website hosted by a former KBR employee, the stated purpose of which was "exposing … corporate greed among [defense] contractors." Uhlig admits that when he sent the email, he had neither retained Doyle as his attorney nor previously been in contact with him. Uhlig had simply found Doyle's name and email address on the Ms. Sparky website.[2]

---

[2] Uhlig's email accusations eventually prompted two members of the Defense Contract Management Agency's quality-assurance staff to investigate the tasks that Fluor's electricians were performing. The staff did not

One week later, Fluor terminated Uhlig. Fluor says Uhlig's email to Ms. Sparky was unacceptable not only because it was inflammatory but also because it contained Thomas Rizzo's name, email address, and phone numbers, which were not publicly available. Sending this information to the Ms. Sparky email address violated Fluor's computer-use policy.

On February 15, 2011, Uhlig filed False Claims Act and retaliatory-discharge claims against Fluor. The government declined to intervene as the plaintiff on its own behalf under 31 U.S.C. § 3730(b)(4)(B).

Fluor moved for summary judgment, and the district court granted Fluor's motion on August 6, 2014. In dismissing the False Claims Act claim, the district court held that Fluor's contract with the Army did not require that journeyman electricians be licensed and therefore that Fluor had not breached the contract. The court dismissed Uhlig's retaliation claim because Uhlig had no objective basis for asserting that Fluor had defrauded the government, thus his complaint was not "protected activity" under the False Claims Act. This appeal followed.

## II. Discussion

We review a district court's grant of summary judgment de novo, examining the record in the light most favorable to

---

find any problems. On-site Defense Contract Management Agency Commander Colonel Cameron Holt said he was not concerned about Uhlig's allegations. Fluor received no written feedback from the Defense Contract Management Agency regarding the investigation, and Fluor was never asked to change its practices or procedures with respect to the assignment of electrical tasks.

the nonmoving party. *United States ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 494 (7th Cir. 2003) (citation omitted). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### A. False Claims

The False Claims Act, 31 U.S.C. § 3729 *et seq.*, makes it unlawful to (1) knowingly present a "false or fraudulent claim for payment or approval" to the United States government, or (2) knowingly make, use, or cause to be made or used a "false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a).

Under the Act, private individuals such as Uhlig—referred to as "relators"—may file *qui tam* civil actions on behalf of the United States. To establish civil liability under the False Claims Act, a relator generally must show that (1) the defendant made a statement in order to receive money from the government; (2) the statement was false; (3) the defendant knew the statement was false; and (4) the false statement was material to the government's decision to pay or approve the false claim. *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822, 828 (7th Cir. 2011) (citations omitted).

Uhlig says Fluor violated the False Claims Act by knowingly employing unlicensed electricians in breach of its contract and submitting invoices for the unlicensed services to the government for payment. However, the contract did not require licensing. Modification 4 to the LOGCAP IV contract required craft employees to "possess a license, certification, training, *and/or* education commensurate with the level of duties to which they are assigned" (emphasis added). Further,

the Trades Certification and Validation Plan, which was the contractual standard by which the employees' qualifications were to be established, also did not require licensing. Rather, the Plan defined "journeyman" as a "[s]killed craftsman … having verifiable minimum experience *and/or* hold[ing] a universally accepted certification, license *and/or* degree" (emphases added).

The contract language clearly provided a set of options for establishing an employee's qualifications, and licensing was not the exclusive method for doing so. Though Fluor independently decided to phase in a self-imposed requirement that journeymen must hold a license, this internal requirement did not change the plain terms of the contract. *See Yannacopoulos*, 652 F.3d at 826. As a result, Fluor was not in breach of its contract with the government when it submitted invoices for electrical work performed by unlicensed electricians.

Uhlig also argues that Modification 4 is an "alternative contract." As a result, he concludes, once Fluor elected one of the four listed means of verifying its electricians' qualifications, Fluor was required to abide by its choice, or else be in breach of the contract. *See Eagle Star Ins. Co. v. Seneca Ins. Co.*, No. 94 CIV. 9106 (JFK), 1995 WL 733642, at *3 (S.D.N.Y. Dec. 12, 1995).

We disagree. *Eagle Star* describes an alternative contract as:

> one in which a party promises to render some one of two or more alternative performances, either one of which is mutually agreed upon as the bargained-for equivalent given in exchange

> for the return performance by the other party.
> Once a party elects its method of performance,
> the contract ceases to be an alternative contract
> and the electing party is obligated to perform in
> accordance with the method of performance
> elected by him.

*Id.* (internal citations and quotation marks omitted).

The Letter Agreement in *Eagle Star* contemplated mutually exclusive performance options. *See id.* at *4. Here, however, the language in Modification 4 and the Trades Certification and Validation Plan contemplates compatible choices, as indicated by the repeated use of "and/or" in describing the qualification options.

Indeed, a plain reading of Modification 4 and the Trades Certification Validation Plan is that Fluor needed to ensure that its electricians were qualified for the duties to which they were assigned by virtue of at least one of the following: license, certification, training, or education. Nothing in the contract suggests that Fluor was required to elect one method of verifying its electricians' qualification and that Fluor would then be limited to that method. In other words, under the contract, Fluor could ensure that one electrician was qualified via education, another via certification, and a third through licensure, so long as each was qualified. Further, the contract did not forbid Fluor from applying higher internal licensure policies to American electricians relative to other-country national electricians. The contract at issue, therefore, is not an "alternative contract."

Finally, Uhlig cites to emails from Fluor employees allegedly interpreting the contract to prohibit unlicensed other-

country nationals from performing electrical work. However, these messages do not change the contract's plain terms. *See Yannacopoulos*, 652 F.3d at 826 (when "[t]he language of [the contract] is clear on its face, … the intent of the parties is to be derived only from the express language of the contract") (citation and internal quotation marks omitted).

Fluor did not breach its contract. Therefore, there was no false statement under the False Claims Act, and we affirm the district court's decision.

## B. Retaliation

Uhlig next argues that the district court erred in dismissing his retaliation claim. An employee can pursue a claim for unlawful retaliation if he was discharged "because of lawful acts done by the employee … in furtherance of an action under" the False Claims Act. 31 U.S.C. § 3730(h). In other words, a plaintiff must prove that he was engaged in protected conduct and was fired "because of" that conduct. *Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847 (7th Cir. 2012) (citations omitted).

To determine whether an employee's conduct was protected, we look at whether "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004) (citation omitted). In assessing the second, "objective" prong, we look to the facts known to the employee at the time of the alleged protected activity. *See id.* at 479–80; *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 345 (4th Cir. 2010).

Uhlig's retaliation claim cannot proceed because he did not show that, at the time he sent the December 4, 2010 email, a reasonable employee in Uhlig's position would have believed Fluor was defrauding the government. As a result, his conduct was not protected activity that could give rise to a retaliation claim.

Uhlig admits he did not read Modification 4, the Trades Certification and Validation Plan, or any other relevant contract language before he sent the December 2010 email. He therefore did not have any firsthand knowledge of Fluor's contract obligations to the Army.

Further, his secondhand knowledge—from two November 2010 emails—was not sufficient to cause a reasonable person to suspect fraud on the part of Fluor. The November 16, 2010 email explained Fluor's decision to reclassify unlicensed electricians as "bring[ing] Fluor into better alignment with [its] contractual requirements." The November 19, 2010 email stated that because Uhlig did not have a license, he was being reclassified as a helper "to align [Fluor's] job titles and basic job responsibilities with the appropriate license, in accordance with our contract with the client."

Neither of these messages stated that Fluor's contract with the government required all electrical work to be performed by licensed journeymen or that there was no role for unlicensed helpers. The emails do not state Fluor's contractual obligations to the government. Thus, these emails were not enough to cause someone in Uhlig's position to believe that Fluor was defrauding the government.

Even if Uhlig subjectively believed Fluor was breaching its contract, he lacked a sufficient basis on which to satisfy the

objective component of the protected-activity test. Uhlig's emails attempting to blow the whistle on Fluor's alleged non-compliance were therefore not protected activity. As a result, even if the December 2010 email was the reason for Uhlig's termination, it cannot be the basis for a retaliation claim.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.