In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-3117

UNITED STATES OF AMERICA
*ex rel.* JOHN MAMALAKIS,

*Plaintiff-Appellant,*

*v.*

ANESTHETIX MANAGEMENT LLC d/b/a
ANESTHETIX OF TEAMHEALTH, et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 14-CV-349 — **David E. Jones**, *Magistrate Judge.*

ARGUED APRIL 13, 2020 — DECIDED DECEMBER 8, 2021

Before SYKES, *Chief Judge*, and HAMILTON and ST. EVE, *Circuit Judges*.

---

* The parties misspelled the defendant's name as "Anesthestix Management LLC" in the case caption. We use the correct spelling.

SYKES, *Chief Judge*. Dr. John Mamalakis, a Wisconsin anesthesiologist, filed this *qui tam* lawsuit under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, alleging that Anesthetix Management LLC, his former employer, fraudulently billed Medicare and Medicaid for services performed by its anesthesiologists. His central allegation is that the anesthesiologists regularly billed the government using the code for "medically directed" services when their services qualified for payment only at the lower rate for services that are "medically supervised." A magistrate judge dismissed the case, ruling that the complaint did not provide enough factual particularity to satisfy Rule 9(b)'s heightened pleading standard for fraud claims. FED. R. CIV. P. 9(b). The judge gave Mamalakis a chance to amend, directing him to provide representative examples of the alleged fraudulent billing.

Mamalakis obliged, filing an amended complaint that included ten specific examples of inflated billing. Each example identified a particular procedure and anesthesiologist and provided details about how the services did not qualify for payment at the medical-direction billing rate. Six of the ten examples included a specific allegation that the anesthesiologist billed the services using that code; the other four relied on general allegations regarding the group's uniform policy of billing at the medical-direction rate.

The judge held that the amended complaint still fell short under Rule 9(b) and dismissed the case with prejudice. That was error. Although Rule 9(b) imposes a high pleading bar to protect defendants from baseless accusations of fraud, Mamalakis cleared it. The ten examples, read in context with the other allegations in the amended complaint, provide

sufficient particularity about the alleged fraudulent billing to survive dismissal. We reverse and remand for further proceedings.

## I. Background

We begin with the government's billing rules for anesthesiologists. Under Medicare and Medicaid regulations, anesthesiologists may submit claims for payment to the government under one of three billing codes corresponding to the level of services provided. 42 C.F.R. § 414.46(b). The highest billing rate is reserved for cases in which the anesthesiologist "personally performed" the procedure. This rate applies if the anesthesiologist (1) performed the anesthesia services alone; (2) was the teaching physician directing a resident or intern physician during the procedure; or (3) continuously participated in a single procedure involving a certified registered nurse anesthetist, an anesthesiologist assistant, or a student nurse anesthetist. *Id.* § 414.46(c).

The "medical direction" rate is half the personal-performance rate. *Id.* § 414.46(d)(3)(v). An anesthesiologist may bill at the medical-direction rate if he directed a resident or intern, certified registered nurse anesthetist, anesthesiologist assistant, or student nurse anesthetist in two, three, or four concurrent procedures *and* he personally performed or participated in each of the following steps in each procedure: (1) conducted the preanesthetic examination and evaluation; (2) prescribed the anesthesia plan; (3) participated in the most demanding parts of the plan, including induction and emergence, if applicable; (4) ensured that any procedure he did not personally perform was performed by a qualified individual; (5) monitored the anesthesia administration at frequent intervals; (6) remained physically present and

available for immediate diagnosis and treatment of an emergency; and (7) provided postanesthetic care as indicated. *Id.* §§ 414.46(d), 415.110(a)(1). To qualify for payment at the medical-direction rate, the anesthesiologist must personally document that the seven conditions were satisfied and specifically confirm that he performed requirements 1, 3, and 7. *Id.* § 415.110(b).

The lowest billing rate applies when the physician "medically supervises anesthesia services" performed by other anesthesia professionals. *Id.* § 414.46(f). Special billing rules apply when the anesthesiologist medically supervises more than four concurrent procedures. *Id.*

With the regulatory framework in place, we recount the facts as alleged in the operative amended complaint. In 2008 Dr. Mamalakis began working as an anesthesiologist at All Saints Hospital in Racine, Wisconsin. He was employed by Southeastern Anesthesia Consultants, which contracted with All Saints to provide anesthesia services for the hospital's patients. Southeastern did not employ nurse anesthetists, so its anesthesiologists personally performed the anesthesia services and Southeastern billed Medicare and Medicaid at the personal-performance rate.

In early January 2010, All Saints dropped Southeastern as its provider of anesthesia services and awarded the contract to Anesthetix Management LLC. Mamalakis accepted an offer of employment from the new provider. At around the same time, Anesthetix Management was acquired by Team-Health Holdings, Inc., a nationwide holding company of providers of clinical services to hospital systems around the country. Both Anesthetix Management, doing business as Anesthetix of TeamHealth, and the holding company

TeamHealth are named as defendants. We refer to them collectively as "TeamHealth."

Unlike Southeastern, TeamHealth employs nurse anesthetists and planned to have its anesthesiologists medically direct procedures rather than personally perform them. At an orientation session on January 10, 2010, Dr. Sonya Pease, the new medical director, told the anesthesiologists that they should "document each procedure with the goal of fitting it within the Medicare guidelines for medical direction." She explained that the anesthesiologists should sign the anesthesia record every 15 minutes indicating that they had checked in on the patient. Mamalakis alleges that he and other anesthesiologists interpreted her statement as an instruction that they should sign the patient record as if they were present at every 15-minute interval during the procedure even if they were not.

TeamHealth thereafter converted the anesthesia practice at All Saints to "100% medical direction across the board." The new system "was designed to allow TeamHealth anesthesiologist[s] to perform more procedures concurrently[] and bill for the procedures in accordance with the regulatory framework" for medically directed anesthesia services.

Mamalakis alleges that after this transition, his fellow anesthesiologists frequently failed to satisfy the conditions required for billing at the medical-direction rate yet routinely billed at that rate in accordance with the new business model. More specifically, he alleges that anesthesiologists regularly failed to perform preanesthetic exams and evaluations, did not personally prescribe anesthesia plans, did not monitor the patient at frequent intervals during procedures, did not participate in the most demanding parts of the

procedure, and sometimes were not physically present to handle emergencies. He alleges that TeamHealth was aware that its anesthesiologists did not comply with these conditions for payment at the medical-direction rate but billed at that rate anyway and therefore knowingly submitted false bills to the government for payment.

Mamalakis further alleges that he brought his concerns about fraudulent billing to Dr. Pease, but she instructed him not to inform All Saints because it might jeopardize Team-Health's contract. Dr. Pease also directed him to let the nurse anesthetists prescribe the anesthesia plans for his procedures—even though an anesthesiologist must do so in order to bill at the medical-direction rate. Mamalakis claims that Dr. Pease stated on numerous occasions that all TeamHealth anesthesia services were to be billed as medically directed regardless of whether the procedure qualified for that rate.

In May 2011 TeamHealth CEO Dr. Steve Gottlieb visited the hospital and met with doctors and administrators. During this visit, Mamalakis tried to tell him about the fraudulent billing practices, but Dr. Gottlieb "abruptly stood up and ran out of the room in an attempt to avoid hearing any more." Dr. Pease thereafter placed Mamalakis under "strict scrutiny" and was "look[ing] for any excuse to terminate his employment." She fired Mamalakis two months later, at the end of July 2011.

In March 2014 Mamalakis filed this *qui tam* suit against TeamHealth alleging violations of several sections of the False Claims Act and similar laws in several states. The case remained sealed for more than a year while the government considered whether to step in and assume control of the litigation. *See* 31 U.S.C. § 3730(b)(4)(B). In June 2015 the

government declined to do so, leaving Mamalakis in charge of the action as the relator. *Id.* § 3730(c)(3). The case was then unsealed, and nearly a year later, Mamalakis filed an amended complaint on behalf of the United States, the District of Columbia, and 16 states seeking treble damages for multiple violations of the Act and similar false-claims laws in six states and the District of Columbia.

TeamHealth moved to dismiss. The case then stalled for about 18 months due to the retirement of the assigned judge and the administrative process of reassigning it to a magistrate judge presiding by consent. Once the case got back on track, the magistrate judge granted TeamHealth's dismissal motion, ruling that the allegations of fraud were too generalized to satisfy the particularity requirement of Rule 9(b). The judge gave Mamalakis a final opportunity to amend, setting a 60-day deadline and instructing him to provide representative examples of fraudulent billing.

Mamalakis timely filed another amended complaint adding ten specific examples of procedures at All Saints in which TeamHealth anesthesiologists failed to comply with the requirements for the medical-direction billing code. Each example identified the procedure in question, the anesthesiologist involved, and the specific ways in which he or she did not perform the services required to bill at the medical-direction rate. For six of the ten examples, the amended complaint affirmatively alleges that the anesthesiologist billed for his or her services at the medical-direction rate. The other four examples rely on the complaint's more general allegations that TeamHealth anesthesiologists uniformly used the medical-direction billing code whether their services qualified for it or not.

TeamHealth again moved to dismiss, and the magistrate judge again granted the motion. He began by noting that Mamalakis's response to the motion was limited to the alleged violation of § 3729(a)(1)(A) of the Act. That section provides a cause of action on behalf of the United States against any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Because Mamalakis offered no argument regarding the other counts in the complaint, the judge summarily dismissed all other claims. Mamalakis does not challenge that ruling, so we limit our discussion accordingly.

Regarding the alleged § 3729(a)(1)(A) violation, the judge held that the ten examples in the latest amended complaint did not cure the deficiencies in the earlier version. He determined that nine of the ten examples failed to provide adequately particularized factual support for the allegation that the anesthesiologists fraudulently billed at the medical-direction rate. The single remaining example, the judge ruled, was not enough by itself to satisfy the heightened pleading burden under Rule 9(b). The judge also rejected Mamalakis's background allegations regarding TeamHealth's billing policies as insufficient to plead fraud with the specificity required by the rule. Focusing on the allegations about Dr. Pease's instructions to anesthesiologists at the January 2010 orientation, the judge explained that her remarks suggested only that the anesthesiologists should provide medically directed care and bill accordingly—not that the doctors should fraudulently bill at the medical-direction rate. On this reasoning the judge dismissed the case in its entirety, and Mamalakis appealed.

## II. Discussion

This once-sprawling case has been narrowed to Mamalakis's claim that TeamHealth violated § 3729(a)(1)(A) of the False Claims Act. That section provides that any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" by the government is liable to the government for civil penalties and treble damages. To prevail on a claim under this provision, the plaintiff "generally must prove (1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false." *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 777 (7th Cir. 2016) (quotation marks omitted). In addition, the defendant's misrepresentation must have been material to the government's payment decision; the Supreme Court has characterized the materiality requirement as "rigorous." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181 (2016).[1]

The Act rewards private relators with a generous share of the proceeds of a successful claim: 15-25% if the government takes over the case; 25-30% if the government declines to do so and the private relator handles it solo. 31 U.S.C. § 3730(d)(1)–(2).

---

[1] Mamalakis alleges that TeamHealth's bills contained express falsehoods; he does not rely on a theory of implied false certification. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 187 (2016); *United States ex rel. Prose v. Molina Healthcare of Ill., Inc.*, 17 F.4th 732, 742 (7th Cir. 2021).

Because the False Claims Act is an antifraud statute, Rule 9(b)'s heightened pleading standard applies, so the complaint must allege the circumstances of the fraud with factual particularity. We have described this burden as requiring the plaintiff to "describe the 'who, what, when, where, and how' of the fraud." *Presser*, 836 F.3d at 776 (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)). This more rigorous pleading standard guards against "the stigmatic injury that potentially results from allegations of fraud." *Id.* However, the knowledge element of the claim may be alleged generally. FED. R. CIV. P. 9(b). What is essential is that the complaint allege with sufficient particularity the facts showing that the defendant made a false statement to obtain money from the government, "injecting precision and some measure of substantiation" into the allegations of fraud. *Presser*, 836 F.3d at 776 (quotation marks omitted).

It follows that alleging fraud "on information and belief" is normally insufficient to satisfy Rule 9(b)'s heightened pleading standard. *United States ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 370 (7th Cir. 2016). While the relator need not "produce the invoices (and accompanying representations) at the outset of the suit," it is nevertheless "essential to show a false statement," though this can be accomplished by including particularized factual allegations that give rise to a plausible inference of fraud. *Lusby*, 570 F.3d at 854.

Mamalakis lacked access to TeamHealth's billing records and thus has not identified specific false invoices. As we've just noted, however, that omission is not fatal to the claim. He has alleged that he has direct knowledge that anesthesi-

ologists regularly falsely coded their procedures for billing purposes after TeamHealth took over the practice group. He provided some factual background about the change in approach to the delivery of anesthesia services under TeamHealth's ownership and the billing policies implemented by the new upper management. Among other things, he described: (1) statements Dr. Pease made at the 2010 orientation about the shift to the medical-direction billing rate; (2) her instruction to him that he should not micromanage the nurse anesthetists and instead let them create anesthesia plans; (3) her insistence that he not inform All Saints of his suspicions of fraudulent billing activity; and (4) her repeated direction that it was the policy of Team-Health to bill all procedures as medically directed, whether or not a procedure met the requirements for that rate. He also described his attempt to bring his allegations of fraudulent billing to Dr. Gottlieb's attention, alleging that Dr. Gottlieb ran out of the room to avoid hearing more.

These generalized allegations that anesthesiologists engaged in fraudulent billing after the transition to Team-Health's ownership are insufficient under Rule 9(b), even when read against the backdrop of the complaint's more particularized allegations about Dr. Pease and Dr. Gottlieb. We therefore cannot fault the magistrate judge for insisting that Mamalakis provide specific representative examples of fraudulent billing. But we disagree with the judge's conclusion that the examples in the latest version of the complaint fall short of the mark. Mamalakis provided ten specific examples in which an anesthesiologist failed to comply—sometimes egregiously—with the requirements to submit a bill at the medical-direction rate. He alleged that each procedure involved a patient insured by Medicare or Medicaid

and that he knew that each procedure was billed to the government. For six procedures Mamalakis affirmatively alleged that the anesthesiologist billed at the medical-direction rate despite failing to comply with the requirements for that rate. These allegations are as follows:

- In June 2011 Dr. Lee billed three procedures as medically directed (one general-surgery procedure, one urology procedure, and one hysterectomy), but he left the hospital before noon and spent the afternoon waiting for a piano to be delivered. Mamalakis learned of this situation when Dr. Disque called him to say that he was already directing two procedures and could not direct all three of Dr. Lee's rooms without exceeding the four-procedure maximum required to qualify for the medical-direction rate.

- In spring 2010 Dr. Peters billed a hip replacement as medically directed, but she left the hospital after inducing anesthesia. Dr. Peters called Mamalakis from out of state and asked him to treat the patient's low blood pressure during the procedure.

- In fall 2010 Dr. Peters billed two procedures as medically directed while she was absent from All Saints. When Dr. Pease made a surprise visit, Mamalakis called Dr. Peters and told her to return immediately.

- In spring 2011 Dr. Stroupe billed a knee arthroscopy as medically directed. But when the patient experienced distress, the nurse anesthetist administering the procedure asked Mamalakis to come to the room. When he asked her why Dr. Stroupe wasn't there, she said that he was never present for a knee arthroscopy.

- In winter 2011 Dr. Stroupe billed a gynecological pro-cedure as medically directed, but he was never pre-sent in the operating room, didn't prescribe the anesthesia plan, and didn't provide postoperative care. When the patient suffered distress after emerg-ing from anesthesia, Dr. Stroupe was called. When he arrived at All Saints over 30 minutes later, he was wearing street clothes and then left without examin-ing the patient, ordering studies, or prescribing any treatment. When the patient required further care, Mamalakis was called to assist. Nurse Anesthetist Fitzpatrick told Mamalakis that Dr. Stroupe had billed the procedure as medically directed despite several failures to comply with the requirements for medical direction.

- In fall 2010 Dr. Dean billed a cataract extraction as medically directed, but Nurse Anesthetist Fisher told Mamalakis that Dr. Dean never entered the operating room (even after complications), did not create the anesthesia plan, and did not perform the preanesthet-ic examination required for medical direction.

These examples are detailed, identifying specific doctors and procedures and describing why each procedure should not have been billed as medically directed. And Mamalakis alleged that he became personally involved in some of these procedures after a care provider asked him for assistance—in several cases entering the operating room itself.

The remaining four examples are similarly detailed, alt-hough Mamalakis did not include a specific allegation that the anesthesiologist in question billed for the services using the medical-direction code. For these four examples, he

relied on his more generalized allegations about Team-Health's uniform policy of billing at the medical-direction rate.

Together, these representative examples provide a particularized basis from which to plausibly infer that at least on these occasions, TeamHealth presented false claims to the government. Mamalakis has injected enough precision and substantiation into his allegations of fraud to entitle him to move forward with his case.

Indeed, the allegations here are roughly analogous to the allegations of fraudulent Medicaid billing at issue in *Presser*. There the plaintiff alleged that a medical clinic submitted claims for payment to the government using billing codes corresponding to specific psychiatric services but in fact had performed only nonpsychiatric services. 836 F.3d at 778–79. As we summarized the allegations, the provider "billed Medicaid *for a completely different treatment*" and thus made an express false statement by "misus[ing] a billing code and falsely represent[ing] to the state and federal governments that a certain treatment was given by certain medical staff when in fact it was not." *Id*. at 779. We held that the plaintiff's allegations regarding up-coded billing were sufficient to satisfy the particularity requirement of Rule 9(b). *Id.* at 781.

The ten specific examples of TeamHealth anesthesiologists falsely billing at the medical-direction rate are likewise sufficient to lift the latest version of Mamalakis's complaint over Rule 9(b)'s pleading benchmark. The case may proceed, but it calls for carefully managed discovery to test whether it in fact has evidentiary support. If early managed discovery reveals that TeamHealth did not submit false claims on these

occasions, then it can respond as appropriate. But Mamalakis has pleaded fraud with enough particularity to entitle him to move forward on his claim.

REVERSED AND REMANDED