In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 21-2610

UNITED STATES OF AMERICA
*ex rel.* KENYA SIBLEY, *et al.*,

*Plaintiffs-Appellants,*

*v.*

UNIVERSITY OF CHICAGO MEDICAL CENTER d/b/a
University of Chicago Medicine, *et al.*,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-04457 — **Harry D. Leinenweber**, *Judge.*

———————————

ARGUED MAY 18, 2022 — DECIDED AUGUST 11, 2022

———————————

Before HAMILTON, BRENNAN, and KIRSCH, *Circuit Judges.*

BRENNAN, *Circuit Judge.* Kenya Sibley, Jasmeka Collins, and Jessica Lopez worked for Medical Business Office Corp. ("MBO") and Trustmark Recovery Services, Inc., two jointly owned companies that deliver medical-billing and debt-collection services to healthcare providers. After they raised concerns about their employers' business practices, the three

employees were fired. They sued MBO and Trustmark—as well as the University of Chicago Medical Center ("UCMC"), one of MBO's clients—under the False Claims Act, 31 U.S.C. § 3729, *et seq*. That statute allows private parties, known as relators, to sue on behalf of the United States.

Regulations specify that Medicare providers seeking reimbursement for "bad debts" owed by beneficiaries must have first made reasonable efforts to collect those debts. The relators' allegations concern those regulations. UCMC, they assert, knowingly avoided an obligation to repay the government after it effectively learned that it had been reimbursed for noncompliant debts. Per the relators, MBO and Trustmark caused the submission of false claims to the government by flouting the regulatory requirements. Each relator also brings a retaliation claim against MBO and Trustmark.

The district court dismissed the operative complaint with prejudice. It ruled that UCMC could not be liable because it never recognized any obligation to repay the government. The court also concluded that MBO and Trustmark were not liable for causing the submission of false claims to the government because the complaint did not identify an example of a false statement made in connection with Medicare reimbursements. The retaliation claims were dismissed as well because the relators could not show they reasonably believed their employers were causing the submission of false claims.

We affirm in part and reverse in part. The district court properly dismissed the claim against UCMC, which neither had an established duty to repay the government nor acted knowingly in avoiding any such duty. The direct false claim against MBO was also correctly dismissed. As to MBO, the relators did not meet the applicable standard because they

failed to include specific representative examples of noncompliant patient debts, linked to MBO, for which reimbursement was sought. But the complaint includes specific examples of patient debts as to Trustmark, so we reverse the dismissal of the direct false claim against it. As for retaliation, Sibley and Collins have alleged facts that support the inference that they reasonably believed their employers were causing the submission of false claims to the government. We hold that their retaliation claims may proceed. Lopez cannot meet that standard, though, so her retaliation claim was appropriately dismissed.

**I**

**A**

The federal government reimburses Medicare providers for "bad debts" under 42 C.F.R. § 413.89. If a Medicare patient fails to make required deductible or coinsurance payments, the provider may seek reimbursement from the Centers for Medicare and Medicaid Services ("CMS") for those bad debts. 42 C.F.R. § 413.89(b), (e). There are four longstanding requirements for a debt to be reimbursable:

- The debt "must be related to covered services and derived from deductible and coinsurance amounts";

- The provider "must be able to establish that reasonable collection efforts were made";

- The debt must be "actually uncollectible when claimed as worthless"; and

- "Sound business judgment [must establish] that there was no likelihood of recovery at any time in the future."

*Id*. § 413.89(e); *see also* 31 Fed. Reg. 14808, 14813 (Nov. 22, 1966) (delineating these requirements).

CMS has promulgated specific rules for what actions a provider must take to meet the second requirement—"reasonable collection efforts." For years, those rules were contained in CMS's Provider Reimbursement Manual. Then, in 2020, CMS retroactively codified those regulations at 42 C.F.R. § 413.89(e)(2). CMS explained that the rules had not changed; rather, the newly codified regulations expressed longstanding policies. 85 Fed. Reg. 58432, 58989–96 (Sept. 18, 2020).

Under § 413.89(e)(2), a provider's reasonable collection efforts must last at least 120 days after the issuance of the original bill before a debt is written off as uncollectible. A provider is also required to "[s]tart a new 120-day collection period each time a payment is received within a 120-day collection period." *Id*. § 413.89(e)(2)(i)(A)(5). If a provider takes the appropriate steps, it may seek reimbursement for debts from CMS when it submits its annual cost report. Hospitals are entitled to recover 65 percent of their allowable bad debts for any fiscal year after 2012. *Id*. § 413.89(h)(1)(v).

**B**

This appeal reviews the district court's dismissal of the relators' claims under Federal Rule of Civil Procedure 12(b)(6), so we must accept all well-pleaded facts as true and draw all reasonable inferences in their favor. *United States ex rel. Prose v. Molina Healthcare of Ill., Inc.*, 17 F.4th 732, 738–39 (7th Cir.

2021). The following facts are taken from the relators' operative Second Amended Complaint.

*The UCMC bad debt scheme.* Beginning in 2004, UCMC contracted with MBO to provide billing and collection services. Under the contract, UCMC paid MBO a monthly rate based on the number of MBO employees working full-time to collect debts owed to UCMC. They amended the contract in 2016 to allow MBO to handle additional UCMC accounts, including Medicare and Medicaid accounts receivable. Some of MBO's duties involved collecting debts that Medicare beneficiaries owed to UCMC, which would ultimately report many of those debts to CMS as Medicare bad debts.

UCMC authorized MBO to have up to nine employees working on the Medicare/Medicaid project. Instead, MBO assigned only two employees to work on collecting UCMC's Medicare and Medicaid beneficiary debt while falsely invoicing UCMC for the remaining authorized employees. Keith Sauter, UCMC's Financial Director, managed this arrangement. Sauter profited by receiving purported "consulting fees" from MBO in exchange for not reporting MBO's false invoices to UCMC executives.

When UCMC learned of MBO and Sauter's deception, the hospital system terminated Sauter's employment and began an internal audit of MBO's invoices. The audit confirmed that MBO had overbilled UCMC by at least $270,000 for the Medicare/Medicaid project between November 2016 and September 2017. In January 2018, UCMC's legal department sent MBO a letter. UCMC asserted that MBO had breached the contract by submitting inflated invoices, including those for the Medicare/Medicaid project, and it demanded approximately $700,000 in refunds.

The complaint alleges that, due to the audit, in late 2017 UCMC learned that MBO had only one person working part-time pursuing its Medicare beneficiary debt. Thus, after conducting the audit, UCMC effectively learned it was impossible that MBO had complied with federal regulations concerning reasonable collection efforts for the Medicare bad debts that UCMC had reported for the period between November 2016 and September 2017. At the time, UCMC's internal procedures for filling out cost reports dictated that the hospital system automatically submitted any amounts that MBO deemed uncollectable Medicare bad debts to the government.

In the latter half of 2017, UCMC submitted a cost report covering July 1, 2016 to June 30, 2017. UCMC certified that it had complied with all applicable regulations, and it sought reimbursement for Medicare bad debts, claiming approximately $1.16 million in adjusted reimbursable debt. According to the relators, the certification was false because UCMC knew of the procedures MBO followed when collecting debts. Despite that knowledge, UCMC never amended the 2017 cost report.

*The Trustmark bad debt scheme*. Trustmark has the same ownership and management as MBO, and the two companies share facilities, equipment, and employees. During the relevant period, Trustmark conducted MBO's bad debt collections for clients other than UCMC. The relators allege that Trustmark, when handling debt collection for other clients, declared Medicare beneficiary debts owed to its clients to be reimbursable bad debts. Trustmark did so even though it ignored the requirements for reimbursable bad debts under 42 C.F.R. § 413.89.

There are three mechanisms through which the relators allege Trustmark violated the bad debt regulations:

- Disregarding the requirement that at least 120 days have passed after the first statement was mailed to the beneficiary, *id.* § 413.89(e)(2)(i)(A)(5);

- Disregarding the requirement of sending the beneficiary multiple statements, *see id.* § 413.89(e)(2)(i)(A)(4), (6); and

- Skipping review of many debts entirely.

As representative examples of how Trustmark's bad debt scheme operated, the relators point to debts that Trustmark handled on behalf of its client Community Hospital.

The operative complaint gives three examples in which MBO and Trustmark (acting on behalf of Trustmark's client, Community Hospital) wrote off patient deductibles as Medicare bad debts fewer than 120 days after the date of service. Trustmark also had access to Community Hospital's software systems. Once Sibley and Trustmark CEO Justin Manning approved Bad Debt Write Off Reports, those amounts were automatically classified as Medicare bad debts. Later, the debts were included in Community Hospital's cost report for that accounting period.

Like UCMC, Community Hospital submitted to the government a cost report for July 1, 2016 to June 30, 2017. Community Hospital certified compliance with all applicable regulations, and it reported $539,100 in reimbursable Medicare bad debt. According to the complaint, that certification was false because Trustmark had failed to undertake reasonable collection efforts under 42 C.F.R. § 413.89 before

declaring the debts owed to Community Hospital to be Medicare bad debts. Thus, the relators allege, the 2017 Community Hospital cost report "is a representative example of Trustmark causing Community Hospital to submit a false claim [to] the Government" in violation of the False Claims Act.

*The relators' complaints and terminations.* Sibley began work for MBO as a manager in its customer service call center in September 2016. She then became a Director of Trustmark, overseeing about 12 employees. At first, Sibley reported directly to Manning, but in February 2017 he instructed her to report to Sandra Schade, a Vice President at Trustmark.

Sibley investigated and then confronted Manning after she learned her name was listed on the invoices sent to UCMC, even though she had not worked on those accounts. She also knew UCMC automatically logged any debt recorded as Medicare bad debt in its accounting systems, and she was aware of the requirement of reasonable collection efforts. Sibley sent Manning Bad Debt Turn Over Error Spreadsheets showing why various patient debts could not be categorized as Medicare bad debts under 42 C.F.R. § 413.89. Eventually, Manning refused to accept them. Sibley alleges Manning and Schade created a hostile work environment to induce her to quit. Shortly after Sibley suffered a medical event, Schade terminated her employment.

Collins began work as a manager in Trustmark's bad debt collections and legal departments in 2016. She oversaw employees in each department. Collins learned that Trustmark used software systems to automatically report bad debt write-offs to its clients. In March 2017, Schade told Collins to categorize the debts of certain Medicare beneficiaries as Medicare bad debts. The patients in question had not received multiple

statements, and fewer than 120 days had passed since their first statements had been issued. Collins protested that this practice violated federal regulations. Schade instructed Collins to follow her directions and prohibited Collins from using the term "illegal." After terminating Sibley, Schade demoted Collins. Collins refused to accept the demotion, so she was fired.

Lopez was a customer service representative with MBO, and her duties included obtaining payments from patients. In October 2016, Lopez spoke to Manning about her concerns with MBO's billing practices, such as double billing. Months later, Lopez detailed her findings in support of her belief that MBO was illegally billing. MBO then terminated Lopez's employment.

## C

The relators filed a complaint against several defendants in the United States District Court for the Northern District of Illinois, alleging numerous violations of the False Claims Act ("FCA"). The United States, Illinois, and Indiana each declined to intervene. Later, the relators filed their First Amended Complaint, naming UCMC, MBO, and Trustmark as defendants. Following the defendants' motion, the district court dismissed that complaint in its entirety. The relators then filed their Second Amended Complaint, which the defendants also moved to dismiss.

The district court again granted the defendants' motion to dismiss, this time declining to permit any further amendment. The court concluded that the claim against UCMC could not proceed because the relators had not identified any point at which the hospital system had recognized overpayment by

the government. The claims against MBO and Trustmark stemming from the bad debt schemes were also subject to dismissal because those allegations were "not linked to a single example of a false statement made in connection with Medicare reimbursements." In the court's view, the cost reports that UCMC and Community Hospital submitted could not support viable FCA claims unless either entity had no bad debt. Finally, the court dismissed the relators' retaliation claims because they could not show that reasonable employees in their positions would have believed MBO and Trustmark were causing the submission of false claims to the government. The relators appealed.

## II

We review de novo an appeal from a district court's grant of a Rule 12(b)(6) motion to dismiss. *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018). We accept all well-pleaded facts as true and draw all reasonable inferences in the relators' favor. Our task is to decide whether the relators stated a claim for relief that is plausible on its face. *Id*.

We begin with the relators' claim for relief against UCMC alleged in Count II of the Second Amended Complaint. Under the FCA, a provision forbidding reverse false claims establishes liability for any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Within the statute, the term "obligation" means "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar

relationship, from statute or regulation, or from the retention of any overpayment." *Id*. § 3729(b)(3).

UCMC contends this claim was properly dismissed for two reasons: (1) the relators did not plead facts sufficient to show UCMC had an obligation to the government; and (2) the operative complaint does not plausibly allege that UCMC acted knowingly in avoiding any such obligation.

## A

The first step in analyzing whether the Second Amended Complaint sufficiently pleaded facts showing UCMC had an established duty to repay the government is determining the applicable pleading standard. It is uncontested that the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply to reverse false claims under § 3729(a)(1)(G). That rule provides that a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). That is, the relators must describe the "who, what, when, where, and how" of the fraud—"the first paragraph of any newspaper story." *Berkowitz*, 896 F.3d at 839 (citation omitted). Though the exact details that must be included in a pleading vary based on the facts of a given case, plaintiffs must inject "precision and some measure of substantiation into their allegations of fraud." *United States ex rel. Mamalakis v. Anesthetix Mgmt. LLC*, 20 F.4th 295, 301 (7th Cir. 2021) (quoting *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016)).

Now consider the question of whether the facts pleaded in the Second Amended Complaint give rise to an established duty by UCMC to repay the government. According to the

relators, UCMC incurred an "obligation" to pay the government once it discovered that MBO had wrongfully caused UCMC to report Medicare bad debts on its cost reports despite a lack of compliance with the regulatory requirements. UCMC disagrees. It contends that the relators do not adequately plead the existence of an obligation because they do not allege the details of either (1) the collection efforts UCMC expended on its own accounts, or (2) the work performed by the two MBO employees who were typically responsible for working on Medicare debts owed to the hospital system. If UCMC did not violate the regulatory requirements to obtain any payments, it incurred no obligation to repay the government.

There is no dispute that under Medicare regulations and CMS guidance, hospitals such as UCMC are permitted to pursue collection of their own debts. Yet, the Second Amended Complaint does not include allegations about whether UCMC made any collection efforts before referring debts to MBO for collection. Without pleading that UCMC declined to conduct its own collection efforts, the relators have not alleged UCMC's failure to comply with the requirements under 42 C.F.R. § 413.89 with sufficient "precision" to defeat dismissal under Rules 9(b) and 12(b)(6). *See Mamalakis*, 20 F.4th at 301; *Presser*, 836 F.3d at 776.

Even more, the Second Amended Complaint alleges that two MBO employees spent a significant amount of their time attempting to collect the debts that Medicare beneficiaries owed to UCMC. But the relators do not specifically allege anything about what the two employees did, on a day-to-day basis, in connection with that work. Instead, the relators allege only that MBO provided far fewer employees than the

number for which UCMC had contracted. From this, the Second Amended Complaint infers that MBO cannot possibly have provided UCMC with reasonable collection efforts under § 413.89.

Under Rule 9(b), though, "generalized allegations" of fraudulent practices are insufficient. *Mamalakis*, 20 F.4th at 301–02. Rather, to defeat dismissal, "specific representative examples" of false submissions are required. *Id*. at 302. *Mamalakis* involved allegations that an anesthesiology practice fraudulently billed Medicare and Medicaid at the elevated medical-direction billing rate for services that only qualified for the lower, medically supervised rate under applicable regulations. *Id*. at 297–99. Our court held that specific examples—there, the precise medical procedures that were performed on certain dates and billed at the medical-direction rate by specific doctors, despite failing to meet the regulatory requirements—were necessary to defeat dismissal of the relator's complaint at the Rule 12(b)(6) stage. *See id*. at 302–03.

*Mamalakis* teaches that the relators here must allege specific examples of patient debts. Those debts must have been incorporated into UCMC's cost reports as reimbursable Medicare bad debts despite not meeting the regulatory requirements, which would render them false claims. But the relators effectively concede they have not identified any specific patient debts that were unlawfully included in UCMC's cost reports. The pertinent allegations involve a "failure of degree" related to understaffing, not an objective lack of compliance with the regulation in any specific case. We therefore hold that the allegations against UCMC fail to adequately set out the requisite "who, what, when, where, and how" of the

fraud. *Id*. at 301; *see also Presser*, 836 F.3d at 776, 779–80 (up-holding a partial dismissal based on that standard).

**B**

Even if we were to conclude the relators adequately al-leged that UCMC had an "obligation" under 31 U.S.C. § 3729(b)(3), to defeat dismissal the relators also must allege facts from which it could be reasonably inferred that UCMC acted knowingly in avoiding such an obligation. Applying that standard, we agree with UCMC that the operative com-plaint also falls short with respect to the hospital system's state of mind.

The scienter requirement of 31 U.S.C. § 3729(a)(1)(G) en-tails a defendant acting "knowingly" in two ways: the defend-ant must have known that it (1) had an obligation to the United States, and (2) was avoiding that obligation. *United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 436–37 (6th Cir. 2016).[1] A defendant's duty to pay the government must be formally "established" before FCA liability for reverse false claims attaches, 31 U.S.C. § 3729(b)(3), and there is no liability for potential or contin-gent obligations. *United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1230–31 (10th Cir. 2017) (collecting cases).

By the terms of the Second Amended Complaint, the rela-tors' allegations do not fit comfortably within this framework. Notably, the operative complaint states that UCMC "never

---

[1] *Accord United States v. Walgreen Co.*, 2021 WL 5760307, at *12–13 (W.D. Va. Dec. 3, 2021); *United States ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 635–36 (N.D. Tex. 2018), *aff'd*, 779 F. App'x 250 (5th Cir. 2019).

determined how much Medicare bad debt [it] reported from November 2016 to August 2017 in [its] cost report received collection effort – let alone reasonable collection effort." Thus, the relators themselves disavow any notion that UCMC had actual knowledge of an obligation to repay the government. To meet the applicable standard, then, they must allege facts that would show UCMC acted in either "deliberate ignorance" or "reckless disregard" of the truth or falsity of the information at issue. 31 U.S.C. § 3729(b)(1)(A)(ii)–(iii). Because Rule 9(b) governs, "generalized allegations" of understaffing will not suffice. *Mamalakis*, 20 F.4th at 301–02.

The only basis the relators have alleged for imputing to UCMC the knowledge that it had violated the law is that the internal audit revealed fewer than nine MBO/Trustmark employees worked on collections for the Medicare/Medicaid project. To conclude that UCMC knew it had an obligation to repay the government, one must assume the following:

- For specific debts that Medicare beneficiaries owed to UCMC, the two MBO employees who regularly worked on UCMC's Medicare accounts did not meet the requirements for reasonable collection efforts under 42 C.F.R. § 413.89;

- UCMC did not itself perform sufficient additional review of the debts in question, either itself or in combination with MBO, or assign them to another debt collector, before declaring them to be reimbursable Medicare bad debts;

- Those debts were included in a cost report that UCMC submitted to the government; and

- The government had reimbursed UCMC for those debts.

Under Rule 9(b), these inferential leaps ask too much. *See Berkowitz*, 896 F.3d at 841–42 (holding dismissal was appropriate because the relator's reliance on several broad inferences prevented him from plausibly alleging fraud). The relators' allegations require the court to stack inference upon inference, and their core premise—that staffing only two employees automatically equates to the absence of reasonable collection efforts—is unsound.

Where a defendant's obligation to pay the government "depends on multiple assumptions," it is "potential and contingent" and thus non-actionable under 31 U.S.C. § 3729(a)(1)(G). *Barrick*, 878 F.3d at 1232. Likewise, in *Olson v. Fairview Health Services of Minnesota*, the Eighth Circuit held that the dismissal of a relator's claim under § 3729(a)(1)(G) was proper. 831 F.3d 1063, 1074 (8th Cir. 2016). That claim was based on a defendant hospital's utilization of a statutory exemption from a reduction in reimbursement rates; the relevant state agency later concluded that the defendant's statutory interpretation was incorrect, and it was not entitled to use the exemption. *Id*. at 1066–68, 1072. Until the state agency issued the defendant a letter of explanation and a notice of recovery in connection with its use of the exemption, the Eighth Circuit explained, the defendant at most had a potential liability—not an established duty. *Id*. at 1074. We find persuasive the approach to analyzing § 3729(a)(1)(G) that our fellow circuits have taken in *Barrick* and *Olson*.

Here, the relators are unable to dispute that any obligation to pay the government that UCMC might have had depends on several assumptions. If, for instance, the two MBO employees had complied with 42 C.F.R. § 413.89 by issuing billing statements and follow-up letters to the Medicare beneficiaries who were indebted to UCMC, no obligation to repay the government would have arisen. The same is true if the debts in question were never incorporated into a UCMC cost report. Despite having multiple opportunities to do so, the relators did not plead the details of the work that the two MBO employees performed on a day-to-day basis, nor did they plead that UCMC failed to take independent steps to collect debts that Medicare beneficiaries owed to it. Such facts would have avoided the need for many of these assumptions.

Given these contingencies, upon discovering MBO's understaffing UCMC "did not have an obligation to remit the reimbursement back to the government; at most, [UCMC] merely had a potential liability and not an established duty." *Olson*, 831 F.3d at 1074. UCMC thus cannot have acted knowingly in avoiding any obligation to repay the government, and the absence of scienter is an independent basis on which we affirm the district court's dismissal of the relators' claim against UCMC. We hold that Count II of the Second Amended Complaint fails to state a claim on which relief can be granted.

### III

Next, we turn to the direct false claims against MBO and Trustmark. This section first discusses the requirements for pleading a direct false claim under the FCA. Then, we consider the claims against MBO (Count I) and Trustmark (Count III).

**A**

Under 31 U.S.C. § 3729(a)(1)(A), liability is established if a person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Liability also attaches if a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id*. § 3729(a)(1)(B). There is no dispute that Rule 9(b)'s heightened pleading standard applies. *Berkowitz*, 896 F.3d at 839. As noted earlier, specific representative examples of fraudulent claims are required to defeat dismissal. *Mamalakis*, 20 F.4th at 301–02.

MBO and Trustmark first argue that they may not be held liable because the relators fail to allege that they made statements to the government to obtain payment. The relators respond that under § 3729(a), defendants may be held liable for causing a false claim to be made to the government, even where the defendant does not directly submit the false claim for payment.

The relators have the stronger argument under both the statute and applicable case law. Start with the statute. Section 3729(a) establishes liability for a defendant that knowingly "causes to be presented" a false claim, or "causes to be made or used … a false record or statement material to" a false claim. Those phrases denote liability for defendants who do not submit claims for payment directly to the government.

Case law leads to the same result. In *United States ex rel. Sheet Metal Workers International Ass'n, Local Union 20 v. Horning Investments, LLC*, a subcontractor prepared payroll reports for a contractor, which the subcontractor knew later forwarded them to the government for payment. 828 F.3d 587,

590–91 (7th Cir. 2016). This court held that the relator had presented "more than enough" evidence of the first element of a direct FCA claim under § 3729—that the defendant made a statement in order to receive money from the government. *Id*. at 592. As the court noted, "False Claims Act liability can attach to any claim that eventually is submitted to the government, even if it goes through an intermediary." *Id*. (citation omitted).

Likewise, other circuits have "made clear that unlawful acts by non-submitting entities may give rise to a false or fraudulent claim even if the claim is submitted by an innocent party." *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 390 (1st Cir. 2011) (citations omitted); *accord United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 243–44 (3d Cir. 2004) (reaching the same conclusion). So, we reject MBO and Trustmark's contention that they may not be held liable under the FCA because they did not submit requests for payment directly to the government.

## B

The next question, then, is whether the relators have alleged facts sufficient to state a cause of action against MBO under § 3729(a)(1)(A) and (B). Underlying that claim, Count I, is the same factual basis as in Count II against UCMC. By providing fewer than the nine full-time employees for which UCMC had contracted, the relators allege, MBO caused UCMC to seek reimbursement for ineligible debts that were not subject to reasonable collection efforts. On that basis, the cost reports in which UCMC sought reimbursement for Medicare bad debts are alleged to contain false claims.

As discussed, the district court correctly required the relators to "provide specific representative examples" of false claims. *Mamalakis*, 20 F.4th at 302. But the relators did not include specific representative examples of patient debts that were included in UCMC's cost reports as reimbursable Medicare bad debts despite a lack of compliance with 42 C.F.R. § 413.89's objective requirements. They rely only on MBO's understaffing of the Medicare/Medicaid project. So, the direct FCA claim against MBO must be dismissed.

The relators' allegations also cannot give rise to a plausible inference of FCA liability when they rely on UCMC's decision to contract for nine full-time employees to work on Medicare and Medicaid debts. According to the Second Amended Complaint, UCMC employee Sauter artificially inflated the number of MBO employees needed to work on UCMC's accounts. He did this to receive kickbacks. It is therefore at least as likely that nine full-time employees were not necessary to perform reasonable collection efforts under 42 C.F.R. § 413.89 for debts owed to UCMC as it is that fewer than nine full-time employees were incapable of meeting the regulation's requirements. The operative complaint does not include allegations about the number of individual debts UCMC referred to MBO, nor does it specifically allege how long it would take an average employee to complete reasonable collection efforts under the regulation. Therefore, the Second Amended Complaint pleads facts "merely consistent with" MBO's liability under § 3729. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Count I fails to state a claim on which relief can be granted.

## C

Applying the same standard to the relators' claim against Trustmark, alleged in Count III, yields a different analysis and result. The operative complaint alleges three specific examples of debts, owed to Community Hospital by its Medicare beneficiary patients and assigned to Trustmark for collection, that were written off as Medicare bad debts without being subject to reasonable collection efforts under 42 C.F.R. § 413.89. Because the three debts were categorized as Medicare bad debts before 120 days had passed from the date of service, it was impossible for Community Hospital to have undertaken reasonable collections efforts at the time those debts were categorized and automatically incorporated into the hospital's 2017 cost report. A collection effort cannot be reasonable under the regulation if it does not last at least 120 days from the date after the first bill is issued to the patient, *see* 42 C.F.R. § 413.89(e)(2)(i)(A), and the first bill necessarily follows the date of service.

These are the types of specific representative examples of fraudulent activity that our court recently held are sufficient to defeat dismissal at the Rule 12(b)(6) stage. *See Mamalakis*, 20 F.4th at 302–03. The relators have specifically alleged the mechanics of how Trustmark improperly declared these three patients' debts as Medicare bad debts and then incorporated them into Community Hospital's 2017 cost report, which sought reimbursement from the government. According to the Second Amended Complaint, in 2017 Community Hospital sought reimbursement for Medicare bad debts incurred in the second half of 2016, which it later received. The reimbursable debts allegedly included the three patient debts in

question. Community Hospital also certified compliance with applicable regulations.

The operative complaint plausibly alleges that the regulatory requirements for reasonable collection efforts, as well as Trustmark's certification of compliance, were material to the government's decision to reimburse the Medicare bad debts claimed by Community Hospital. This includes those three representative debts. *See Mamalakis*, 20 F.4th at 300; *Prose*, 17 F.4th at 740, 742–44. Trustmark made no argument as to materiality in its appellate brief, so it has forfeited the issue. *Scheidler v. Indiana*, 914 F.3d 535, 540 (7th Cir. 2019).

At oral argument, counsel for Trustmark contended that the relators' allegations do not meet the materiality standard set out in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016). Even if this argument were not forfeited in the briefing, it would not prevail. Trustmark is correct that under *Escobar* not all misrepresentations or omissions are material. *See id*. at 193–95. But the prerequisite of reasonable collection efforts is hardly an archetypal example of an immaterial regulatory requirement. To the contrary, it is difficult to imagine that the government would knowingly and systematically reimburse Medicare providers for purported "bad debts" that they did not actually attempt, in good faith, to collect. In any event, Trustmark's belated materiality argument is more appropriate for summary judgment or trial. *See Prose*, 17 F.4th at 740, 743–44 (noting that relators face higher burdens to show materiality at summary judgment and trial than at the Rule 12(b)(6) stage).

Drawing all reasonable inferences in the relators' favor, we hold that they have pleaded facts that would be sufficient to establish § 3729 liability against Trustmark. Thus, the

district court's dismissal of Count III is reversed, and the relators are entitled to proceed to discovery on that claim.

## IV

Each relator also alleges retaliation against MBO and Trustmark in Counts IV, V, and VI of the Second Amended Complaint. In reviewing these claims, we first delineate the correct pleading standard for a claim under this section of the statute. Then, we apply that standard to each retaliation claim, considering the differences between the specific facts alleged by each relator.

## A

Under 31 U.S.C. § 3730(h), an employee, contractor, or agent is entitled to relief if he or she "is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done … in furtherance of" an action under the FCA or "other efforts to stop" a violation of the statute. *Id.* § 3730(h)(1). To recover, a former employee must prove that she engaged in protected conduct and was fired because of that conduct. *Id.*; *Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847 (7th Cir. 2012). In determining whether the former employee engaged in protected conduct, we ask whether "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *United States ex rel. Uhlig v. Fluor Corp.*, 839 F.3d 628, 635 (7th Cir. 2016) (citations omitted).

Just as with the reverse false claim against UCMC and the direct false claims against MBO and Trustmark, all of which arise under § 3729, whether or not Rule 9(b)'s particularity

requirement applies informs our review of the § 3730(h) retaliation claims. Other circuits have held that Rule 9(b) does not apply to FCA retaliation claims. *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 95 (2d Cir. 2017) (collecting cases from the Fourth, Ninth, and D.C. Circuits).[2] This conclusion is logical because a § 3730(h) claim does not allege fraud. It is a retaliation claim similar to those that plaintiffs bring under federal anti-discrimination statutes, such as Title VII. Rule 9(b) does not apply to these types of retaliation claims. *See, e.g.*, *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 781–82 (7th Cir. 2007). Thus, we join the other circuits to consider the issue and hold that a § 3730(h) claim need not be pleaded with particularity under Rule 9(b).

With this in mind, we turn to the district court's analysis of the relators' retaliation claims. Relying on *Uhlig* and *Halasa*, the district court ruled the relators could not "show" that a reasonable employee in their positions would have believed MBO and Trustmark were causing false claims to be submitted to the government. Yet, both cases on which the district court relied were decided at summary judgment. *See Uhlig*, 839 F.3d at 633; *Halasa*, 690 F.3d at 847–48.[3] There, the issues

---

[2] *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 433 (4th Cir. 2015) (stating that FCA retaliation allegations "need pass only Civil Procedure Rule 8(a)'s relatively low notice-pleadings muster—in contrast to Rule 9(b)'s specificity requirements"); *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008); *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1259 (D.C. Cir. 2004).

[3] The district court also referenced *United States ex rel. Crews v. NCS Healthcare of Illinois, Inc.*, 460 F.3d 853 (7th Cir. 2006), which was decided at summary judgment as well.

concerned the quantum of evidence that each relator had adduced in support of his retaliation claim.

Here, the case was before the district court on a Rule 12(b)(6) motion to dismiss. *Uhlig* and *Halasa* were decided after the parties had identified specific, admissible evidence. *See Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (describing the evidentiary burden that a non-movant faces at summary judgment). By contrast, a ruling on a motion to dismiss considers only the pleadings and draws all reasonable inferences in the pleader's favor. *Prose*, 17 F.4th at 738–39. At this stage, a court asks only whether the plaintiff has pleaded a facially plausible claim by alleging "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Berkowitz*, 896 F.3d at 839 (quoting *Iqbal*, 556 U.S. at 678). And because Rule 9(b) does not apply, the relators satisfied their burden to defeat dismissal so long as they provided "some specific facts to support the legal claims asserted in the complaint." *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021) (internal quotation marks omitted).

Properly framed, then, the relators were not required to "show" that reasonable employees in their positions would have believed their employers were submitting false claims to the government. They were only required to allege facts that, when viewed in their favor, support the inference that it was objectively reasonable for them to believe their employers were committing fraud against the government. *See id.* at 588; *Uhlig*, 839 F.3d at 635.

By relying heavily on *Uhlig* and *Halasa* to dismiss the relators' retaliation claims—without discussing the differences in procedural posture or the need to accept the pleaded facts as

true and draw all reasonable inferences in the relators' favor—the district court erred. Further scrutiny of each relator's § 3730(h) claim is necessary.

**B**

Consider first Sibley's retaliation claim. She asserts she was a Director of Trustmark, overseeing about 12 employees. She learned MBO was billing UCMC for nine full-time employees, including herself, while providing only the equivalent of one. Sibley knew UCMC automatically logged any debts that MBO recorded as Medicare bad debts in UCMC's accounting systems, and she knew of the requirements under 42 C.F.R. § 413.89 for reasonable collection efforts. Therefore, she knew MBO's reports caused UCMC to report patient debts that were not subject to reasonable collection efforts as Medicare bad debts on cost reports it submitted to the government. She confronted Manning about the invoices MBO sent to UCMC, at which point he became upset. Sibley also sent Manning the Bad Debt Turn Over Error Spreadsheets detailing the reasons she believed Trustmark was not permitted to write off certain patient debts as Medicare bad debts.

These allegations support an inference that a "reasonable employee in the same or similar circumstances might believe[] that the employer is committing fraud against the government." *Uhlig*, 839 F.3d at 635. Sibley was not a low-level employee; she occupied a managerial role at Trustmark. Importantly, Sibley has alleged knowledge that (1) MBO logged debts that were not subject to reasonable collection efforts as Medicare bad debts; (2) the debts in question were automatically integrated into UCMC's cost reports, and (3) seeking reimbursement for such debts was in violation of regulatory requirements. Sibley's knowledge was personal, which

distinguishes it from the "secondhand knowledge" this court concluded was insufficient to defeat summary judgment in *Uhlig*. *See id*. So, a reasonable employee in her position plausibly would have believed MBO and Trustmark were causing UCMC to submit false claims to the government by filing cost reports seeking reimbursements for debts that were ineligible under the applicable regulation.

Turning to causation, MBO cannot dispute that the facts Sibley alleges in support of her retaliation claim meet the applicable standard. The alleged facts—including Sibley's complaints, Manning's anger when Sibley raised concerns about false invoices, his refusal to accept the Bad Debt Turn Over Error Spreadsheets, and the decision to fire Sibley just after her medical event—permit an inference that Sibley was fired "because of" her efforts to stop potential violations of the FCA. *See* 31 U.S.C. § 3730(h); *Halasa*, 690 F.3d at 847–48. We therefore reverse the dismissal of Count IV of the Second Amended Complaint.

## C

Next, we consider Collins's retaliation claim. Collins was a manager in Trustmark's bad debt collections and legal departments. Through her job responsibilities, she learned Trustmark used software systems to automatically report bad debt write-offs to its clients. Schade instructed Collins to write off Medicare beneficiary debts as Medicare bad debts before 120 days had passed from the date of the patient's first statement and before the patient had received multiple statements. Collins objected to that practice as "illegal," arguing it violated federal regulations. Schade then demoted Collins and fired her when she refused to accept the demotion.

Drawing all reasonable inferences in Collins's favor, we conclude that she has alleged sufficient facts to show that she engaged in protected activity under the FCA. The discussion of § 3730(h)'s scope in *Halasa* is instructive, notwithstanding the different procedural posture. There, an employee reported several potentially unlawful practices to his internal supervisor and company executives. 690 F.3d at 846–47. In reviewing the district court's grant of summary judgment to the employer, this court noted that Congress amended the FCA "to protect employees from being fired for undertaking 'other efforts to stop' violations of the Act, such as reporting suspected misconduct to internal supervisors." *Id*. at 847–48. Because the plaintiff-employee had investigated allegations of his employer's noncompliance with statutory requirements and then reported his findings to supervisors, the court was "satisfied that [his] evidence would permit a trier of fact to find that he engaged in 'efforts to stop' potential FCA violations." *Id*. at 848.

Similarly, Collins alleges that she investigated Trustmark's noncompliance with regulatory requirements and reported her findings to supervisors, including Schade. Under § 3730(h) and *Halasa*, Collins pleads facts to support the inference that she engaged in protected "efforts to stop" potential violations of the FCA. Collins alleges she knew 42 C.F.R. § 413.89 required healthcare providers to take certain steps, such as waiting 120 days from the date the patient first receives a billing statement, before declaring patient debts to be reimbursable Medicare bad debts. Because of Collins's position and her understanding of the software systems that Trustmark and its clients used, her knowledge that MBO and Trustmark were violating the regulation by writing off patient

debts owed to their hospital clients as Medicare bad debts was personal—not secondhand.

Thus, we infer from the well-pleaded facts that a reasonable employee in Collins's position would have believed that MBO and Trustmark were causing their hospital clients to submit false claims to the government. MBO and Trustmark do not offer any meaningful response for why they believe Collins did not engage in protected activity when she protested the categorization of ineligible debts as Medicare bad debts when speaking with Schade.

As to causation, at this stage Collins's allegations also meet the statutory requirement that she was fired "because of" her protected conduct. 31 U.S.C. § 3730(h); *Halasa*, 690 F.3d at 847. The Second Amended Complaint alleges that Schade reacted negatively to Collins raising the issue of regulatory requirements and prohibited her from using the term "illegal" on the job. Collins was then demoted because of her concerns, and she was fired when she refused to accept the demotion. These facts support an inference that the causation element was satisfied.

Against this, MBO and Trustmark argue that Collins has not pleaded a connection between her internal complaints and the overbilling of UCMC. But that assertion is beside the point, as § 3730(h) only requires that Collins allege she was fired "because of" her "other efforts to stop" potential FCA violations. Protected conduct includes reporting suspected misconduct to supervisors. *Halasa*, 690 F.3d at 847–48. A specific connection to UCMC, which was only one of the clients that MBO and Trustmark serviced, is not necessary to support Collins's retaliation claim. Collins has adequately alleged that she engaged in protected activity and was fired because of

that activity. She has thus stated a claim for relief under § 3730(h), and we reverse the district court's dismissal of Count V of the Second Amended Complaint.

**D**

Finally, we turn to Lopez's retaliation claim. The factual underpinnings of her claim are quite different from those that support Sibley and Collins's claims. Unlike Sibley and Collins, Lopez was not a manager, but rather a customer service representative with MBO. She did not work on projects relating to writing off patient debts as Medicare bad debts. Instead, Lopez sought to obtain payments from patients, often following the text of scripts her supervisors provided. Moreover, when Lopez voiced concerns about MBO's billing practices to Manning, those concerns related to patient complaints of double billing, not MBO's compliance with bad debt regulations.

Though we accept the facts pleaded in the Second Amended Complaint as true, we conclude that Lopez lacked a reasonable basis for believing MBO was causing the submission of false claims to the government. The operative complaint does not allege Lopez had personal knowledge of either (1) 42 C.F.R. § 413.89 and its requirements for reasonable collection efforts; or (2) how MBO and Trustmark's hospital clients handled debts that those defendants labeled as Medicare bad debts. Lopez lacked firsthand knowledge of these facts, and she has not alleged secondhand knowledge. Thus, even if Lopez were to prove the facts she has alleged, she would nevertheless be unable to recover on her retaliation claim. *See Uhlig*, 839 F.3d at 635; *United States ex rel. Ziebell v. Fox Valley Workforce Dev. Bd., Inc.*, 806 F.3d 946, 953 (7th Cir. 2015).

Although the Second Amended Complaint asserts Lopez believed MBO's double billing was "illegal," it does not elucidate why this would be so. Nor does the complaint explain how the double billing about which Lopez complained had anything to do with claims that were submitted to the government for payment. Even crediting all well-pleaded facts as true and drawing all reasonable inferences in Lopez's favor, *Prose*, 17 F.4th at 738–39, her report of illegal activity lacked the required "reasonable objective basis." *Lang v. Northwestern Univ.*, 472 F.3d 493, 495 (7th Cir. 2006). Accordingly, we affirm the district court's dismissal of Count VI of the Second Amended Complaint.

## V

In conclusion, the relators' reverse false claim against UCMC is subject to dismissal because they have not pleaded facts sufficient to show that UCMC either had an obligation to the government or acted knowingly in avoiding that obligation. And because the relators have not pleaded specific examples of noncompliant debts for which UCMC sought reimbursement, we also uphold the dismissal of the direct false claim against MBO. As to Trustmark's client Community Hospital, though, the relators have pleaded specific examples. So, their direct false claim against Trustmark may proceed.

On the retaliation claims, Sibley and Collins have alleged an objectively reasonable basis for believing their employers were causing fraudulent claims to be submitted to the government. They have also sufficiently alleged causation. Thus, the dismissal of their retaliation claims is reversed. But Lopez has not alleged facts that would show she had an objectively reasonable basis for believing her employer was causing

fraudulent claims to be submitted to the government, so her claim was properly dismissed.

Our disposition of the district court's dismissal of the Second Amended Complaint is as follows:

Count I, direct false claim against MBO—Affirmed;

Count II, reverse false claim against UCMC—Affirmed;

Count III, direct false claim against Trustmark—Reversed;

Count IV, Sibley retaliation claim—Reversed;

Count V, Collins retaliation claim—Reversed; and

Count VI, Lopez retaliation—Affirmed

The judgment of the district court is AFFIRMED in part and REVERSED in part, and the case is REMANDED to the district court for proceedings consistent with this opinion.